USCA1 Opinion

 

 February 6, 1995 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 94-1613 GOLDEN RULE INSURANCE COMPANY, Plaintiff, Appellant, v. CATHERINE ATALLAH, Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Morton A. Brody, U.S. District Judge] ___________________ ____________________ ERRATA SHEET ERRATA SHEET The opinion of this Court issued on January 23, 1995, is amended as follows: On cover sheet, Curtis Dickinson's name should read "Curtis J. Dickinson" and on the last line of page 5 of the opinion "Dr. Preston" should read "Dr. Croswell". United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 94-1613 GOLDEN RULE INSURANCE COMPANY, Plaintiff, Appellant, v. CATHERINE ATALLAH, Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Morton A. Brody, U.S. District Judge] ___________________ ____________________ Before Selya, Cyr, and Stahl, Circuit Judges. ______________ ____________________ Curtis J. Dickinson with whom Dickinson & Associates, Wendell G. ___________________ _______________________ __________ Large, Elizabeth G. Stouder, and Richardson & Troubh were on brief for _____ ____________________ ___________________ appellant. Mark G. Furey with whom Thompson, McNaboe, Ashley & Bull were on _____________ _________________________________ brief for appellee. ____________________ January 23, 1995 ____________________ STAHL, Circuit Judge. Plaintiff-appellant Golden STAHL, Circuit Judge. _____________ Rule Insurance Company ("Golden Rule"), an Illinois corporation, appeals a judgment awarding defendant-appellee Catherine Atallah ("Atallah") $263,698.68 for medical expenses pursuant to an insurance contract ("the Policy") between the parties. Golden Rule contends that Atallah's illness, a meningioma, or tumor of the brain lining, was a preexisting condition excluded from coverage under the Policy and therefore the district court erred in not granting Golden Rule judgment as a matter of law. We agree that Golden Rule was entitled to judgment as a matter of law, and now vacate and remand so that judgment may be entered accordingly. I. I. __ BACKGROUND BACKGROUND __________ By late 1991, those who knew Catherine Atallah realized that something was amiss with her. Divorced about eight years previously, Atallah, then 49, of Waterville, Maine, had become increasingly reclusive over the previous several years, and she was becoming increasingly unable or unwilling to perform the ordinary tasks of everyday life. She failed to pay bills, and her utility and telephone services were cut off more than once. She fell several months behind in mortgage payments on her home, and she allowed her driver's license to lapse. When the doorbell or telephone rang, she often would refuse to answer. She -2- 2 bathed, changed clothes and combed her hair infrequently, and she left soiled pots and pans in her kitchen for weeks at a time. A family friend persuaded Atallah to seek medical attention in June 1991, but a routine examination turned up no obvious clues to her condition. She also visited a social worker twice that summer, and explained that she was doing so to learn "why I am the way I am." She failed to show up for a scheduled third visit and did not arrange a further appointment. In November 1991, Atallah's condition had deteriorated to the point that her oldest son, Peter Atallah, obtained from her a power-of-attorney permitting him to oversee her affairs. One of the first things Peter Atallah did was attempt to purchase medical insurance for his mother, who was then uninsured. This effort failed because of an apparent mix-up over the method of payment. In June 1992, Peter Atallah arranged for Dr. David Preston, an internist, to visit his mother at home. In a lengthy letter to Dr. Preston, Peter Atallah related his mother's personal and medical history, including a previous thyroid condition and hysterectomy about eight years earlier. He told Dr. Preston that he and his brothers want our mother back. We believe she is suffering from chronic depression, but that there are chemical imbalances (thyroid, estrogen) that are making a bad -3- 3 situation much worse. We cannot rule out the need for mental therapy, but we have not been able to get a handle on the whole problem. Dr. Preston visited Atallah in her home on June 24, 1992. The ensuing physical exam yielded no remarkable findings other than that she had lost fifteen pounds during the previous six months and had suffered a gradual decrease in vision over the previous few years. Dr. Preston noted that Atallah's thyroid condition should be rechecked and the cause of her weight loss determined. He also noted that he believed she was "a danger to herself though in a sort of low grade fashion," and that he discussed with her the advisability of seeking inpatient psychiatric treatment "as she has really failed to connect" with anyone as an outpatient. In deposition testimony read into the trial record, Dr. Preston stated that Atallah did not think inpatient treatment was necessary but that she agreed to see a psychiatrist on an outpatient basis, and that he "thought that that would be a good start." Dr. Preston did not specifically recommend that Atallah receive an EEG or CT scan. He recalled, however, that Atallah was reluctant to undergo expensive tests or hospitalization because of concerns about her lack of insurance coverage. At Dr. Preston's direction, Atallah went to the hospital later that day for blood tests and a chest x-ray. These tests revealed no findings significant to her condition. -4- 4 Dr. Preston then referred Atallah to Dr. Robert Croswell, a psychiatrist. Dr. Croswell saw Atallah first on July 2 and again on July 9. He prescribed for Atallah the drug Zoloft, an anti-depressant. At the July 9 session, according to Dr. Croswell's videotaped deposition testimony, he recommended that Atallah submit to inpatient evaluation because he was concerned that he was not getting a full and accurate view of the extent of her condition and he "thought that a good way to clarify the issue would be to get her into the hospital so we could do a more thorough evaluation . . . ." While obtaining brain wave test results was not the primary reason Dr. Croswell suggested inpatient treatment, such treatment would have included these tests, Dr. Croswell testified, and would probably have led to the discovery of the tumor. Dr. Croswell also testified at his deposition that Atallah did not want to submit to inpatient evaluation because of insurance concerns. Later in that deposition, he stated that Atallah's refusal to submit to inpatient treatment and her concerns about insurance coverage were not necessarily causally linked, and that "it certainly was never clear that the reason she refused was purely because of ______ insurance coverage." (emphasis added) Dr. Croswell's handwritten notes from the July 9 session do not indicate that he actually discussed inpatient treatment with Atallah on that day, or that she expressed concerns about insurance -5- 5 coverage. The notes do, however, contain a notation indicating that at the very least Dr. Croswell was considering the suitability of three different inpatient treatment facilities for Atallah. Atallah did not keep her appointment with Dr. Croswell for July 23, but he did see her on July 27 and 28. On July 28, Dr. Croswell entered into a "contract" with Atallah. The contract called for Atallah to continue taking Zoloft and visiting Dr. Croswell at his office each week. If this treatment produced no improvement in three to four weeks, the Zoloft dosage would be doubled. If there was still no improvement in two months, Dr. Croswell testified, he told Atallah he would be unwilling to continue seeing her on an outpatient basis and would insist that she submit to inpatient evaluation.1 However, Atallah failed to show up for any further visits with Dr. Croswell. In a letter to Maine's Department of Human Services Disability Determination Services dated August 4, Dr.  ____________________ 1. In his consultation notes prepared on September 30, 1992 -- after Atallah had finally been admitted to a hospital for a fainting spell but before her tumor had been discovered -- Dr. Croswell wrote: I think we are seeing gradual evolution of a thought disorder here. Certainly medical work up (sic) is necessary including electroencephalogram and CT brain scan to rule out organic etiology. Such a work up has been recommended to the patient a couple of months ago but she refused inpatient evaluation and had some real concerns about insurance coverage. -6- 6 Croswell wrote that Atallah "shows evidence of severe poverty of content of thinking with grossly impaired judgment at times regarding her own needs." He wrote that it was his "impression" that Atallah suffered from a "gradually increasing disability" with the diagnosis of "major depression, severe and persistent," and "passive aggressive personality disorder." Dr. Croswell had "[n]o diagnosis" of any physical condition. Meanwhile, after learning that his mother was still uninsured, Peter Atallah applied for Medicare/Medicaid coverage on her behalf. Expecting a delay before the application was approved, he purchased a short-term, non- renewable medical insurance policy from Golden Rule, effective August 9, 1992. The Policy contained a clause stating that Golden Rule would not pay for medical bills attributable to preexisting conditions. The Policy defined "preexisting condition" as: an illness2 or injury: (1) for which the covered person received medical advice or treatment within the 60 months  ____________________ 2. The Policy defines "illness" as a sickness or disease . . . . All illnesses that exist at the same time and _________ which are due to the same or related causes are deemed to be one illness. _______ Further, if an illness is due to causes _______ which are the same as, or related to, the causes of a prior illness, the illness _______ _______ will be deemed a continuation of the prior illness and not a separate illness. _______ _______ -7- 7 immediately preceding the Effective Date . . . ; or (2) which, in the opinion of a qualified doctor, (a) probably began prior to the Effective Date . . .; and (b) manifested symptoms which would cause an ordinarily prudent person to seek diagnosis or treatment within the 60 months immediately preceding the Effective Date . . . . On September 29, 1992, while talking on the telephone with her son Peter, Atallah suffered a "syncopal episode," or fainting spell. She was taken to Mid-Maine Medical Center in Portland, where a CT scan and EEG were performed. To the surprise of her treating physicians, the tests revealed a grapefruit-sized tumor growing on the lining surrounding Atallah's brain -- in medical terms, a bifrontal olfactory groove meningioma.3 Atallah underwent surgery on October 8, 1992, and doctors were able to remove about half of the tumor. The medical bills for Atallah's hospital stay, surgery and eight months of recuperative care following surgery totalled $263,698.68. When Atallah submitted a claim to Golden Rule for payment, the company refused to pay, citing the Policy's preexisting condition clause. In denying coverage, Golden  ____________________ 3. Dr. Eric Omsberg, who diagnosed the meningioma from CT scan and EEG test results, wrote in his consultation note that Atallah had not previously had a "workup regarding the possibility of a central lesion, but there has been no specific indication to do such since her exam remains nonfocal except for mental status, higher cognitive functionings, and calculations." -8- 8 Rule relied on both definitions contained in the Policy, explaining that Atallah had received treatment and advice for her illness in the five years prior to August 9, 1992, and that it had obtained the opinion of a qualified doctor to the effect that her illness had manifested symptoms which would cause an ordinarily prudent person to seek diagnosis or treatment within the five years prior to August 9, 1992. Golden Rule instituted a declaratory judgment action in the district court in May 1993. Atallah filed a counterclaim for breach of contract. During the two-day trial, Golden Rule's expert witnesses, Drs. Norman Oestrike and John Boothby testified that Atallah's symptoms were such that she should have received a CT scan and EEG to test for the possibility of an organic cause of her depression. Atallah offered the testimony of Dr. Richard Toran, who testified that in his opinion there was no need to order a CT scan for Atallah before August 9 because her symptoms were all explicable by her personal history. All of the doctors who treated Atallah either before or after the ultimate diagnosis agreed that her severe depression and reclusiveness were caused by the tumor and that the tumor had been growing for many years. After all the evidence had been submitted, Golden Rule moved for judgment as a matter of law, which the district court denied. The jury returned a special verdict -9- 9 for Atallah, concluding that her tumor was not a preexisting condition under the Policy. The district court entered judgment for Atallah in the full amount claimed. The district court then denied Golden Rule's renewed motion for judgment as a matter of law and motion for a new trial, and Golden Rule now appeals.4 II. II. ___ STANDARD OF REVIEW STANDARD OF REVIEW __________________ Our review of a denial of a motion for judgment as a matter of law is plenary. Acevedo-Diaz v. Aponte, 1 F.3d ____________ ______ 62, 66 (1st Cir. 1993). As did the district court, we view the evidence in the light most favorable to the nonmovant and decide whether any reasonable jury could have returned the verdict it did. See Sanchez v. Puerto Rico Oil Co., 37 F.3d ___ _______ ___________________ 712, 716 (1st Cir. 1994). Thus, we reverse the district court's denial of the motion only if the facts and inferences "point so strongly and overwhelmingly in favor of the movant" that a reasonable jury could not have reached a verdict against that party. Aponte, 1 F.3d at 66 (internal quotation ______  ____________________ 4. In addition to appealing the district court's denial of its motions for judgment as a matter of law and for a new trial, Golden Rule also appeals several of the district court's evidentiary rulings made before and during trial and its denial of proffered jury instructions. Because our decision on Golden Rule's motion for judgment as a matter of law is dispositive, we do not discuss the disputed evidentiary rulings. We do, however, obliquely discuss the matter of instructional error in the course of passing upon Golden Rule's entitlement to judgment as a matter of law. See infra Part III(B). ___ _____ -10- 10 omitted). In performing this analysis, "`we may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence.'" Sanchez, 37 F.3d _______ at 716 (quoting Wagenmann v. Adams, 829 F.2d 196, 200 (1st _________ _____ Cir. 1987)). III. III. ____ DISCUSSION DISCUSSION __________ We must decide whether a reasonable jury could have concluded from all the evidence that Atallah was entitled to recover under the Policy despite its preexisting condition exclusion. The jury concluded that Atallah was entitled to insurance benefits because her illness5 did not fit under either of the Policy's definitions of "preexisting condition." Our assessment of the jury verdict's rationality hinges on the meaning of the Policy's preexisting condition clause. Under Maine's general law of contracts, the interpretation of a contract is a question for the factfinder  ____________________ 5. Golden Rule contends that the Policy's definition of "illness" sweeps together Atallah's depression and tumor as one illness. Atallah argues that the definition only addresses situations in which the insured actually has two ________ ___ causally-related illnesses -- i.e., an insured with AIDS- related pneumonia who later develops AIDS-related cancer -- and not situations such as her own, in which the only "true" illness was her tumor. Because both parties agree that under either interpretation Atallah's "illness" would at least comprise her tumor, and because resolution of this particular issue is unnecessary to our decision, we treat Atallah's "illness" as meaning her tumor only. We offer no opinion on the proper interpretation of the "illness" definition. -11- 11 only if the court first determines that the contract is ambiguous, a question of law. Willis Realty Assoc. v. Cimino ____________________ ______ Constr. Co., 623 A.2d 1287, 1288 (Me. 1993). Because ____________ exclusions from coverage in insurance contracts are not favored and must be stated clearly and unambiguously, ambiguities in such contracts must be resolved against the insurer. Baybutt Constr. Corp. v. Commercial Union Ins. Co., _____________________ _________________________ 455 A.2d 914, 921 (Me. 1983), overruled on other grounds by _________ __ _____ _______ __ Peerless Ins. Co. v. Brennon, 564 A.2d 383 (Me. 1989); see __________________ _______ ___ also Maine Bonding & Cas. Co. v. Philbrick, 538 A.2d 276, 277 ____ ________________________ _________ (Me. 1988); Allstate Ins. Co. v. Elwell, 513 A.2d 269, 271 _________________ ______ (Me. 1986). However, this latter rule of construction "is a rule of last resort which must not be permitted to frustrate the intention the parties have expressed, if that can otherwise be ascertained," Tinker v. Continental Ins. Co., ______ _____________________ 410 A.2d 550, 554 (Me. 1980), and "a court may not rewrite the contract when the language employed is free of doubt." Palmer v. Mutual Life Ins. Co., 324 F. Supp. 254, 257 (D. Me. ______ ____________________ 1971). Finally, we note that we must determine the intention of the parties by examining "the whole instrument," and we must do so "with an eye to the subject-matter, the motive and purpose of making the agreement, and the object to be accomplished." General Elec. Capital v. Ford Motor Credit, _____________________ _________________ 149 B.R. 229, 233 (D. Me 1992). A. Interpretation of the Preexisting Condition Clause ______________________________________________________ -12- 12 The Policy's language defines an illness as a preexisting condition if it fits either of the two definitions contained in the Policy's preexisting condition clause. Under the first definition (the "Treatment Clause"), a preexisting condition is an illness or injury "for which" ___ _____ the insured actually received medical advice or treatment before the Policy's effective date. The second definition (the "Symptoms Clause") focuses not on advice or treatment actually received, but rather on whether a reasonable person would have sought diagnosis or treatment if afflicted with _____ ____ the insured's symptoms before the Policy's effective date. Because we hold that a rational jury could not have concluded that Atallah's tumor was not a preexisting condition under the Policy's Symptoms Clause, we do not address the proper interpretation or application of the Treatment Clause.6 The Symptoms Clause presents us with language that neither we nor Maine courts, as reflected in reported  ____________________ 6. We considered a clause similar to the Treatment Clause in Hughes v. Boston Mut. Life Ins. Co., 26 F.3d 264 (1st Cir. ______ __________________________ 1994). In that case, we held that a disability policy defining "preexisting condition" as a "sickness or injury for ___ which the insured received treatment" was reasonably _____ susceptible of two interpretations. Id. at 266, 269 ___ (emphasis added). We stated that the phrase could reasonably "require[] some awareness on the part of the physician or the insured that the insured is receiving treatment for the condition itself," id. at 269, and we construed it against ___ the insurer for purposes of summary judgment, id. at 270. ___ Hughes is distinguishable because the policy at issue in ______ Hughes contained nothing similar to the Symptoms Clause at ______ issue here. -13- 13 decisions, have previously confronted.7 Atallah argues that the clause must mean that the symptoms would cause a prudent person to seek diagnosis or treatment of a brain tumor or a __ _ _____ _____ similarly organic brain disease. On its face, however, the clause does not require either a correct diagnosis of the underlying illness or any awareness on the part of the insured or her physician of the nature of the underlying illness. The words "for which" -- present in the Treatment Clause and on which our decision in Hughes8 turned -- are ______ noticeably absent from the Symptoms Clause. The Symptoms Clause presents a linguistically uncomplicated test. It simply asks: In the opinion of a qualified doctor,9 did the  ____________________ 7. Maine recently adopted a statutory provision containing language quite similar to the Symptoms Clause. Under this provision, a preexisting condition clause "may only relate to conditions manifesting in symptoms that would cause an ordinarily prudent person to seek medical advice, diagnosis, care or treatment or for which medical advice, diagnosis, care or treatment was recommended or received during the 12 months immediately preceding the effective date of coverage." Me. Rev. Stat. Ann. tit. 24-A, 2850 (West Supp. 1994). Maine courts have yet to interpret this provision. In any case, this provision was not in effect when Atallah purchased her Policy, and the parties have not argued its relevance. 8. See supra note 6. ___ _____ 9. We do not take this phrase to mean that if Golden Rule obtains the opinion of a single qualified doctor in its favor, the case is over. Rather, we take it to mean that Golden Rule must obtain the opinion of a qualified doctor in order to deny coverage under the Symptoms Clause, but that, if the facts permit a qualified physician, properly applying the policy definitions, to reach a contrary opinion -- which is not the case here -- then the factfinder would be free to decide what an ordinarily prudent person would do. Cf. Clark ___ _____ v. Golden Rule Ins. Co., 887 F.2d 1276, 1279 (5th Cir. 1989). ____________________ -14- 14 illness "manifest symptoms" which would cause an ordinarily prudent person to seek diagnosis or treatment within the five years prior to the Policy's effective date? We are unable to ascribe any ambiguity to this test. We think the only plausible meaning of the phrase is just what it says. The clause does not require that the insured seek a particular kind of diagnosis -- indeed, common sense tells us that one seeks a diagnosis precisely because one is uncertain of the cause of particular symptoms. It merely requires that the symptoms be such that an ordinarily prudent person would seek diagnosis or treatment. If an insured experiences such symptoms within the sixty months prior to the Policy's effective date, then whatever illness is ultimately determined to have caused those symptoms will be deemed a preexisting condition and will be excluded from coverage.  ____________________ In Clark, the only other circuit court opinion interpreting _____ language virtually identical to the Symptoms Clause, the court affirmed the denial of coverage for coronary bypass surgery for a patient with high cholesterol and triglyceride levels and who had experienced chest pains or tightness in the chest a few months before buying insurance. In doing so, the court rejected the insured's argument that he had received a "clean of bill of health" following a cardiac stress test before purchasing insurance and therefore he had no reason to seek diagnosis or treatment for his subsequent chest pains. The court ruled that "`the opinion of a qualified physician' is the test under the policy, and [four doctors] all testified that an ordinarily prudent person with [the insured's symptoms] would seek diagnosis or treatment." Id.  ___ -15- 15 Atallah argues that interpreting the Symptoms Clause in this way runs counter to the traditional function of preexisting condition clauses, which is to prevent fraud by protecting the insurer from people who are already sick but who intentionally delay diagnosis or treatment until after they purchase insurance.10 We do not agree.  ____________________ 10. To achieve the fraud-prevention function while at the same time protecting the insured from being deprived of benefits for preexisting conditions of which they have no knowledge, many courts have construed preexisting condition clauses as applying only when an insured experiences "a distinct symptom or condition from which one learned in medicine can with reasonable accuracy diagnose the illness." Mogil v. California Physicians Corp., 267 Cal. Rptr. 487, 491 _____ ___________________________ (Cal. Ct. App. 1990) (internal quotation omitted and collecting numerous cases). In such cases, however, courts generally were confronted with policies containing no specific definition of preexisting condition, see, e.g., ___ ____ Hannum v. General Life & Accident Ins. Co., 745 S.W.2d 500 ______ _________________________________ (Tex. Ct. App. 1988), or with clauses that defined such conditions as illnesses -- not symptoms -- that first "exist," "begin," "commence," "manifest," or enter some similarly imprecise stage, before the policies became effective. See, e.g., Mutual Hosp. Ins., Inc. v. Klapper, ___ ____ ________________________ _______ 288 N.E.2d 279, 282 (Ind. Ct. App. 1972) ("exist"); Kirk v. ____ Provident Life & Accident Ins. Co., 942 F.2d 504, 505 (8th ____________________________________ Cir. 1991) ("begin"); Lincoln Income Life Ins. Co. v. Milton, ____________________________ ______ 412 S.W.2d 291 (Ark. 1967) ("first commences or first becomes evident"); Mayer v. Credit Life Ins. Co., 202 N.W.2d 521, 523 _____ ____________________ (Mich. Ct. App. 1972) ("first manifested"). Our research uncovered no reported decision in which a court faced with language similar to the Symptoms Clause at issue here nevertheless adopted the foregoing common-law definition. But cf. Pfeffer v. Reserve Life Ins. Co., No. 89-4698, 1990 ___ ___ _______ _____________________ WL 142056, at *3 (E.D. La. Sept. 20, 1990) (construing preexisting condition clause excluding coverage if insured experienced "symptoms which would cause an ordinarily prudent person to seek medical diagnosis, care or treatment" as meaning "diagnosis, care or treatment for cancer" (emphasis ___ ______ added)). -16- 16 It is true that denying coverage under a preexisting condition clause to a person who at the time of purchase has no idea that she is ill serves no fraud- __ ____ prevention function.11 The Policy's Symptoms Clause does not go so far; it would not exclude coverage, for example, of Atallah's tumor if she had experienced no symptoms before the __ Policy's effective date. The Symptoms Clause only denies coverage for undiagnosed illnesses if the insured is on notice that something is not right with her; to allow the _________ insurer to contractually deny coverage for whatever may ultimately prove to be the cause of the malady in fact does ____ serve the policy of protecting the insurer from deceitful purchasers. It is not difficult to imagine an uninsured person experiencing symptoms of unknown origin putting off medical diagnosis or treatment until he can purchase insurance. Atallah, of course, actually did seek medical diagnosis and treatment before purchasing insurance. But the plain language of the Symptoms Clause affords no basis on  ____________________ 11. Nonetheless, courts have enforced contracts containing clauses that are clearly drafted to achieve such a result. See Medical Serv. of D.C. v. Llewellyn, 208 A.2d 734, 736 ___ ______________________ _________ (D.C. 1965) (denying coverage for gallstone removal when policy excluded benefits for preexisting conditions "whether known or not known" by the insured); see also Knepp v. ___ ____ _____ Nationwide Ins. Co., 471 A.2d 1257, 1259 (Pa. Super. Ct. ____________________ 1984) (stating that "[w]here . . . a policy of insurance is drawn to cover only prospective illnesses the insured's knowledge or lack of knowledge of the pre-existing illness is immaterial"). -17- 17 which to make an exception for an insured who in good faith obtains an incomplete diagnosis and consequently fails to discover the full extent of her illness before purchasing insurance. The clause is an objective manifestation of mutual intent to insure against the risk of future illness or injury, not against the risk that an earlier diagnosis turns out to be wrong. Furthermore, while interpreting the clause exactly as written in cases of incorrect diagnosis may not obviously serve a fraud-prevention function, neither does it impair that function. Medical diagnosis is an inexact art. A doctor's ability to diagnose an illness correctly may depend on what symptoms a patient is experiencing at a particular time; how clearly the patient expresses her symptoms to her doctor; the doctor's own experience and inclination to administer tests; and the patient's willingness to undergo tests sooner rather than later. An insurer may well prefer to avoid these vagaries entirely and simply fix the time at which it will assume risk at a point before any significant symptoms occur. Indeed, Atallah's "contract" with Dr. Croswell underscores this point. Far from being conclusive, Dr. Croswell's diagnosis of depression was a starting point from which he and Atallah hoped to find an underlying cause and appropriate treatment. While it is unlikely that Dr. Croswell would have discovered the tumor before August 9, it -18- 18 is likely that the course of treatment they agreed to would have ultimately led to the tumor's discovery had she upheld her part of the "contract." Atallah's own conduct -- perhaps beyond her own control because of her tumor, but certainly beyond Golden Rule's control -- hindered the diagnostic process by her failure to keep appointments, her reluctance to undergo expensive tests or hospitalization, and her denial of the seriousness of her symptoms. B. The Rationality of the Jury Verdict _______________________________________ Having concluded that the Symptoms Clause is susceptible of but a single interpretation, we can only conclude that a rational jury could not decide that Atallah's tumor was anything other than a preexisting condition. Atallah does not dispute that her reclusiveness, severe depression and impaired judgment were, in retrospect, caused by her tumor, that the tumor had existed for many years prior to the Policy's effective date, or that Golden Rule obtained the requisite opinion of a qualified doctor. While the jury might reasonably have concluded that an ordinarily prudent person afflicted with Atallah's symptoms would not have sought diagnosis or treatment for a brain tumor, that is not ___ _ _____ _____ the test.12 Properly instructed on the law, a rational  ____________________ 12. The district court incorrectly permitted counsel for Atallah to argue this interpretation of the contract to the jury, and we suspect the jury found the argument appealing. Although the court instructed the jury that Atallah was bound by the terms of her contract, it refused to provide any -19- 19 jury could have reached no conclusion other than that an ordinarily prudent person whose mental health and ability or willingness to care for herself had deteriorated to the extent that Atallah's did in the several months prior to the Policy's effective date would have sought diagnosis or treatment -- just as Atallah actually did in consulting Dr. Preston and Dr. Croswell. This conclusion is in no way undercut by the testimony of Atallah's expert, Dr. Toran. Thus, Atallah's tumor falls squarely within the second definition of the Policy's preexisting condition clause. We recognize that our literal interpretation of the Policy's Symptoms Clause may lead to harsh results in some cases. But "sympathy . . . cannot justify sophistry," Hughes, 26 F.3d at 268-69, and the Policy that Atallah ______ purchased permits no conclusion other than that her tumor was a preexisting condition. Therefore, Golden Rule is entitled to judgment as a matter of law. The judgment below is Vacated and remanded for the entry of judgment Vacated and remanded for the entry of judgment ___________________________________________________ consistent with this opinion. Costs to appellant. consistent with this opinion. Costs to appellant. ____________________________ __________________  ____________________ clarification of what the preexisting condition clause meant, which would have counteracted counsel's improper argument. -20- 20