Audrey **VAN VOLKENBURG**, Plaintiff,

v.

**CONTINENTAL CASUALTY INSURANCE COMPANY**, Defendant.

Civ. No. 94–324.

United States District Court, W.D. New York.

Feb. 20, 1997.

Leonard Berkowitz, Orchard Park, NY, for Plaintiff.

William S. Reynolds, Oshea, Reynolds & Cummings, Buffalo, NY, for Defendant.

## MEMORANDUM & DECISION

SCOTT, United States Magistrate Judge.

### Background

Plaintiff Audrey Van Volkenburg, claims that defendant Continental Casualty Insurance Company ("CNA") wrongfully denied her claim for long-term disability benefits after she became unable to work during her fight against cancer. Defendant contends that plaintiff's period of disability resulted from a pre-existing condition which negated coverage.

On July 6 and 7, 1995, a non-jury trial was conducted to determine if plaintiff's disability resulted from a pre-existing condition which would exclude coverage under the long-term disability policy issued by defendant.

### The Trial Evidence

The vast majority of the factual circumstances surrounding this matter are not disputed. The parties stipulated that the primary issue in the case was whether a pre-existing condition worked to preclude plaintiff from receiving long-term disability benefits (July 6 TT. at 2) [1]; that plaintiff's notice of claim was timely filed and in proper form (July 6 TT. at 5); that defendant does not dispute that plaintiff's cancer was not diagnosed until after the policy went into effect on April 1, 1991 (July 6 TT. at 5–6); and that plaintiff exhausted all necessary internal procedures and appeals with CNA (July 6 TT. at 82–83).

The parties also agree that plaintiff began employment at Our Lady of Victory Hospital

---

**1.** Two different court reporters recorded and transcribed the trial testimony. The page numbering of the transcript of the second day of testimony starts at number 1, instead of continuing on from the last page number of the first day of testimony. Thus, all citations to the July 6, 1995 trial transcript are designated "July 6 TT. at ——"; references to the July 7, 1995 trial transcript are designated "July 7 TT. at ——".

(OLV) as a Licensed Practical Nurse (LPN) on April 1, 1991 (July 6 TT. at 8) and that the long-term disability policy at issue ("the policy") was part of plaintiff's benefits package as an employee of OLV and that the effective date of the policy was April 1, 1991. (July 6 TT. at 19–20).

At trial, plaintiff testified she first discovered a lump in her left breast in January 1991 and that on January 16, 1991 she saw her then-primary physician, Dr. Ruh regarding the lump. At that time, Dr. Ruh palpated the lump and sent plaintiff for a mammogram. (July 6 TT. at 8–9) On January 18, 1991 a mammogram was taken. On January 23, 1991 plaintiff went back to Dr. Ruh who advised her that the mammogram was negative. (July 6 TT. at 10) According to plaintiff, Dr. Ruh advised her that the lump was "just a cyst". At no time did Dr. Ruh mention cancer during this visit. (July 6 TT. at 10).

On March 14, 1991, plaintiff underwent a pre-employment physical in the health office at OLV. Plaintiff testified that she informed the doctor conducting the physical that she had a lump on her left breast, and that she was going to have it removed. The OLV Employee Health History record, admitted into evidence as Plaintiff's Exhibit 12, reflects that the doctor conducting the examination did not examine plaintiff's breast. (July 6 TT. at 17–18) CNA does not contend that plaintiff hid the existence of the lump from OLV in any way.

Plaintiff next saw Dr. Ruh on March 22, 1991. At that time, the lump in her breast had grown and was painful. Dr. Ruh once again palpated the lump and recommended that plaintiff see Dr. Apen, a surgeon. Once again, Dr. Ruh did not mention or discuss the possibility of cancer with plaintiff. (July 6 TT. at 11).

Plaintiff first saw Dr. Apen on March 28, 1991. At that appointment, Dr. Apen palpated the lump and asked if it was painful. Plaintiff testified that she told Dr. Apen that it was painful and that she wanted the lump removed. Dr. Apen diagnosed the lump as being a "cyst" and agreed to remove it. Just as with Dr. Ruh, Dr. Apen did not discuss the possibility of cancer with the plaintiff. (July 6 TT. at 12).

Dr. Apen removed the cyst on April 5, 1991 in the outpatient department at Mercy Hospital. After noting to her that the cyst was larger than he expected Dr. Apen drained the wound. According to plaintiff, the surgery did not take long and she went home. (July 6 TT. at 13).

On April 9, 1991, plaintiff once again saw Dr. Apen. At that time, Dr. Apen advised plaintiff that the biopsy of the lump was cancerous and diagnosed the condition as "adenoma carcinoma". Plaintiff testified that Dr. Apen appeared surprised at the biopsy results because the symptoms of cancer were not present and that it was unusual for someone of her age to develop this problem. Plaintiff testified that this was the first time Dr. Apen had ever mentioned cancer to her. (July 6 TT. at 14).

Plaintiff subsequently underwent chemotherapy treatments, a bone marrow transplant, radiation treatments, a modified radical mastectomy of her breast on April 16, 1991, and further surgery in May of 1991 to deal with metastatic cancer which had spread to her neck. (July 6 TT. at 15–16).

On cross-examination, plaintiff testified that she has sued Dr. Ruh for malpractice because he did not obtain a biopsy of the lump in her breast in January of 1991. (July 6 TT. at 29, 33–34).

Dr. Edward Apen also testified at trial. Dr. Apen first saw plaintiff on March 28, 1991. According to Dr. Apen, upon examination of plaintiff and reviewing the results of the mammogram ordered by Dr. Ruh, he concluded that the lump in plaintiff's breast was fibrocystic disease. This was consistent with Dr. Ruh's findings. Dr. Apen recommended excision of the lump. (July 6 TT. at 41–42) Dr. Apen testified that he thought the lump was a benign thick tissue often seen in young women that disappears as the women age. (July 6 TT. at 42) According to Dr. Apen, the lump in plaintiff's breast was tender and painful and that such characteristics are not typical of a cancerous mass. (July 6 TT. at 44) Indeed, Dr. Apen's notes from the March 28, 1991 examination describe the

lump as "nothing suspicious", by which Dr. Apen testified that he meant "nothing suspicious for cancer". (July 6 TT. at 54).

Dr. Apen testified that as he was removing the lump on April 5, 1991, he did consider that the mass could be a "benign tumor" because it looked like one at that point. Notwithstanding this possibility, Dr. Apen's postoperative diagnosis, as reported in the Postoperative Report admitted as Plaintiff's Exhibit 14, was that the mass was a cyst. (July 6 TT. at 47–48).

Dr. Apen testified that the first time he knew it was cancer was April 9, 1991 when he read the pathology report. Dr. Apen also testified, however, that had he known it was cancer prior to the surgery, he still would have proceeded in the same manner.[2] Dr. Apen testified that the excision of the lump is not adequate treatment for cancer and that a modified radical mastectomy was performed because there was some residual cancer in the breast tissue. (July 6 TT. at 49–50) The pathology performed after the mastectomy indicated that the cancer had spread to plaintiff's lymph glands which necessitated chemotherapy. (July 6 TT. at 51–52) Dr. Apen testified that the chemotherapy would prevent plaintiff from working.[3] (July 6 TT. at 53) Dr. Apen stated that plaintiff was not disabled until April 9, 1991 or April 19, 1991 when there was a diagnosis of metastatic cancer. Finally, Dr. Apen testified that plaintiff was not treated for cancer until after it was diagnosed on April 9, 1991. (July 6 TT. at 58).

On cross-examination, Dr. Apen testified that the standard treatment upon observing a breast mass in a young women is to watch it for two months, and if it doesn't go away, perform a biopsy. (July 6 TT. at 62) A somewhat existential dialog between Dr. Apen and defendant's counsel concluded with Dr. Apen's testimony that plaintiff probably had breast cancer for three and one-half years prior to April 1, 1991 (July 6 TT. at 65–67) However, Dr. Apen declined to agree that plaintiff had lymphatic cancer prior to April 1, 1991 and stated that it is not possible to determine how long plaintiff had lymphatic cancer from the pathology reports because the growth of this disease is highly differentiated. (July 6 TT. at 68–69).

On re-direct, Dr. Apen testified that the excision of the actual mass removed from plaintiff on April 5, 1991 in and of itself would not have prevented her from returning to work within a few days. (July 6 TT. at 76) It was the invasion of the lymph system which caused plaintiff's disability. (July 6 TT. at 79) Finally, Dr. Apen testified that if he had suspected the lump to be cancerous he would probably have performed an incisional biopsy, as opposed to the excisional biopsy which was performed, because if there is a clinical impression that it is a cancer, it is likely that major definitive treatment would be required. (July 6 TT. at 81).

Dr. Richard G. Cooper testified as an expert witness on behalf of the defendant. Dr. Cooper testified that, in his opinion, plaintiff "sought advice because of a palpable lesion in her breast, which she found in January, for which a subsequent workup revealed it to be malignant". (July 7 TT. at 6) Dr. Cooper opined that the lump for which plaintiff sought treatment from Drs. Ruh and Apen prior to April 1, 1991 was the same lump which turned out to be cancerous. (July 7 TT at 7) This is not seriously disputed.

On cross-examination, Dr. Cooper agreed that the mammogram taken of plaintiff in January 1991 was negative for any malignant lesions. (July 7 TT. at 13) Dr. Cooper testified that the malignancy was not diagnosed until April 5, 1991 when Dr. Apen performed the initial surgery. (July 7 TT. at 16) Dr. Cooper also testified that "ideally", once the lump was determined to be malignant, and assuming the cancer had not spread outside the lump, the lymph nodes should be removed and radiation therapy would be required. Dr. Cooper testified that had the

---

**2.** On re-cross examination, Dr. Apen testified that "in retrospect" he can not say whether he would have performed an incisional biopsy (the use of a needle to get a small piece of the mass for analysis), as opposed to the excisional biopsy which was performed. (July 6 TT. at 79)

**3.** The record does not reflect that the defendant contests plaintiff's inability to work during the designated disability period.

cancer not metastasized the plaintiff would have been able to return to work in two months, perhaps sooner, after excision of the cancerous lump. (July 7 TT. at 22–23).

Dr. Cooper testified that the original pathology following the April 5, 1991 surgery provided some evidence that the cancer had spread to the lymph nodes prior to April 1, 1991 because of the size of the tumor. (July 7 TT. at 25) Finally, Dr. Cooper testified that in his opinion plaintiff had cancer prior to April 1, 1991. (July 7 TT. at 29).

## Discussion

### 1. Standard of Review

■ Although the parties were in agreement that the standard of review to be applied in this case is whether CNA's determination was arbitrary and capricious, a review of the controlling case law and the language of the insurance policy indicate that such a view is incorrect. The language of the policy determines whether the court must apply the arbitrary and capricious standard of review or whether the court may review the determination *de novo*. If the language of the policy gives the plan administrators "discretion" to "interpret" the terms of the policy, the arbitrary and capricious standard applies. If the policy does not vest the plan administrators with this discretion, then the court may review the determination *de novo*. *Firestone v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Jordan v. Retirement Committee of Rensselaer Polytechnic Institute*, 46 F.3d 1264 (3d Cir.1995); *Masella v. Blue Cross*, 936 F.2d 98 (2d Cir.1991).

In the instant case, the court's review of the policy[4], admitted as Plaintiff's Exhibit 1, reveals that no such discretion is reserved for the policy administrator. Thus, the court must conduct a *de novo* review of CNA's determination. *Masella v. Blue Cross*, 936 F.2d 98 (2d Cir.1991).

### 2. Interpretation of the Contract

■ A "federal common law of rights and obligations" governs the interpretation of

a group insurance plan subject to the Employee Retirement Income Security Act ("ERISA"). *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Burnham v. Guardian Life Ins. Co. of America*, 873 F.2d 486 (1st Cir.1989); *Hughes v. Boston Mutual Life Ins. Co.*, 26 F.3d 264 (1st Cir.1994). As noted in *Hughes*, however, the need for uniformity in this area does not require federal rules at variance with the general law of the states. Indeed, the emerging federal common law should embody common-sense canons of contract interpretation of which state law is the richest source. *Hughes*, 26 F.3d at 268, citing *Rodriguez–Abreu v. Chase Manhattan Bank N.A.*, 986 F.2d 580 (1st Cir.1993).

■ While the "straightforward language in an ERISA-regulated insurance policy should be given its natural meaning," (*Burnham*, 873 F.2d at 489), it is well-settled that ambiguous terms should be construed against the insurer. See *Masella v. Blue Cross & Blue Shield of Conn.*, 936 F.2d 98, 107 (2d Cir.1991); *Hughes*, 26 F.3d at 268; *Rodriguez–Abreu*, 986 F.2d at 586; See also *Golden Rule Insurance Co. v. Atallah*, 45 F.3d 512 (1st Cir.1995); and *Lee v. Blue Cross/Blue Shield*, 10 F.3d 1547 (11th Cir. 1994) (collecting cases to demonstrate that the *contra proferentum* rule has been widely adopted among circuit courts for resolution of ambiguities in ERISA-regulated insurance contracts).

■ With this framework in mind, the court now turns to review the terms of the policy in this case. The "Exclusions and Limitations" declaration set forth on page H of the policy provide that the policy does not cover any loss caused by or resulting from a pre-existing condition. The "Definitions" declaration set forth on page E of the policy defines a pre-existing condition as follows:

> Pre-existing condition means a condition for which medical treatment or advice was rendered, prescribed or recommended

---

**4.** At the close of trial, the court noted that Plaintiff's Exhibit 1 states that it was not the "actual policy" but instead is an "insurance certificate". Counsel for CNA represented that she had reviewed the actual policy and that it was "identical" to Exhibit 1. July 7 TT. at 45. All references to "the policy" herein refer to Plaintiff's Exhibit 1.

within 3 months prior to [the insured's] effective date of insurance.

The policy does not further define what is encompassed by the word "condition". The policy definition of "sickness", as it relates to this case, is circular and of little help. According to the policy: " 'Sickness' means sickness or disease causing loss which begins while [the insured's] coverage is in force. Sickness shall not include any loss caused by or resulting from a pre-existing condition".

Initially, it should be noted that the language of the policy does not exclude coverage of *all* pre-existing conditions. The plain language of the policy requires that for the exclusion to apply the advice or treatment of the "condition" must have been "rendered, prescribed or recommended" within three months prior to the effective date of the policy. Thus, as was the case in *Hughes*, the policy at issue in this case would *not* exclude coverage (1) if the condition existed prior to the effective date of the contract but plaintiff received *no* medical advice or treatment whatsoever; or (2) if the condition existed prior to the effective date of the contract and plaintiff *received* medical advice or treatment, but such advice or treatment was rendered *more than three months before* the effective date of the contract. See *Hughes*, 26 F.3d at 268.

CNA's interpretation of "condition", would include the treatment of any symptom of the disease that caused the disability whether or not the disease was diagnosed at the time the symptom was treated. Such an interpretation has some support. See *Bullwinkel v. New England Mut. Life Ins. Co.*, 18 F.3d 429 (7th Cir.1994); *Cury v. Colonial Life Ins. Co.*, 737 F.Supp. 847 (E.D.Pa.1990). On the other hand, plaintiff reasonably argues that to obtain advice or treatment regarding a medical "condition", you must first have some awareness that the "condition" exists. This interpretation also has support. See *Hughes*, 26 F.3d 264 (1st Cir.1994); *Ross v. Western Fidelity Ins. Co.*, 881 F.2d 142 (5th Cir.1989). See also *Mannino v. Agway Inc.*

*Group Trust et al.*, 192 A.D.2d 131, 600 N.Y.S.2d 723 (2d Dept.1993).

The *Hughes* case is particularly instructive. In *Hughes*, during the probationary period just prior to the effective date of the policy the plaintiff received medical attention for various symptoms consistent with multiple sclerosis ("MS") but was not diagnosed as having MS until after the effective date of the policy. Reviewing the pertinent language of the policy at issue in that case, the First Circuit held that an ambiguity existed, and resolving the ambiguity against the insurer, accepted the construction offered by the plaintiff. *Hughes*, 26 F.3d at 269–70. In vacating summary judgment granted for defendant, the *Hughes* court noted that under the accepted interpretation offered by the plaintiff, "a physician's awareness of the sickness would probably required at least a tentative diagnosis; however, it may be that no diagnosis would be necessary if the insured was already aware of the condition." *Hughes*, 26 F.3d at 270, n. 5.[5]

The First Circuit's insights in *Golden Rule Insurance Co. v. Atallah*, 45 F.3d 512 (1st Cir.1995) are similarly instructive. In *Golden Rule*, the insured suffered from a brain tumor which was not diagnosed until after the effective date of the health insurance policy. Because the pre-existing condition provision of that policy specifically excluded conditions for which medical advice or treatment was obtained within 60 months prior to the effective date of the policy, *or:*

> [w]hich in the opinion of a qualified doctor, (a) *probably began prior to the Effective Date ...; or* (b) *manifested symptoms which would cause an ordinarily prudent person to seek diagnosis or treatment within the 60 months immediately preceding the Effective Date ....*

*Golden Rule*, 45 F.3d. at 515 (emphasis added).

The court in *Golden Rule* expressly notes that it is the existence of this clause, which the court called the "Symptoms Clause", which distinguished *Golden Rule* from the *Hughes* case. *Golden Rule*, 45 F.3d at 517 n.

---

**5.** The court in *Hughes* remanded the matter back to the district court for further proceedings holding that "despite any interpretive presumption favoring the insured, the insurer may seek to overcome that presumption with probative evidence at trial." *Hughes*, 26 F.3d at 270 n. 6.

6. Based on this specific language, the court found that no ambiguity existed in that case. *Golden Rule,* 45 F.3d at 518.

In the instant matter, the policy at issue contains no language remotely similar to the Symptoms Clause language found in *Golden Rule.* Instead, as in *Hughes,* and as discussed supra at page 122, it is apparent that the pre-existing condition provision at issue in this case is susceptible to alternate interpretations. Indeed, the Symptoms Clause language included in the *Golden Rule* policy is an example of how such a provision could have been drafted to eliminate any ambiguities.

This court's finding is consistent with various state court decisions which, although not controlling, are instructive. In *Mannino v. Agway Inc. Group Trust et al.,* 192 A.D.2d 131, 600 N.Y.S.2d 723 (2d Dept.1993), the court was asked to interpret a pre-existing condition clause similar to that in this case.[6] There the court found the language to be susceptible to several interpretations. The court concluded that if "condition" is equated to mean "disease", then it is arguable that any treatment or advice rendered prior to a diagnosis could not be considered as having been given for that condition. *Mannino,* 600 N.Y.S.2d at 726 citing *Scarborough v. Aetna Life Ins. Co.,* 572 S.W.2d 282 (Tex.1978) (for the exclusion to apply it is necessary for the insured to have received medical advice directed toward a known condition).

Although some of the factual circumstances in *Bullwinkel v. New England Mut. Life Ins. Co.,* 18 F.3d 429 (7th Cir.1994) are similar to those present in this case, several factors work to diminish its value as precedent. Most significantly, the Seventh Circuit itself placed severe limits on the precedential value of the opinion, stating:

[T]his case is unique because the Bullwinkel's attorney really rested his entire appeal on the argument that a court may not infer that a lump discovered to be cancerous in one month was also cancerous two months before.... We make no statement about what might happen if an attorney in a future case presents different arguments and authority to the court.

*Bullwinkel,* 18 F.3d at 433. In addition, unlike the instant case, although the doctors treating tie plaintiff in Bullwinkel did not definitively diagnose the condition as cancer prior to the effective date of the policy, they suspected that the lump might be cancerous and recommended procedures to confirm its status. Finally, the court's opinion in *Bullwinkel* does not present the detail of its analysis of the contract language.

Like the First Circuit in *Hughes* this court does not find *Cury v. Colonial Life Ins. Co.,* 737 F.Supp. 847 (E.D.Pa.1990) to be persuasive. As noted in *Hughes, Cury* focused exclusively on the absence of a requirement for diagnosis without seriously considering whether the language concerning treatment or advice for a particular condition was ambiguous. *Hughes,* 26 F.3d at 270, n. 5.

In conclusion, because the language in the policy at issue in the instant case is susceptible to reasonable but differing interpretations, the court finds the contract to be ambiguous and adopts the view offered by plaintiff. Inasmuch as the policy language does not exclude all conditions which were, in fact, pre-existing, but only excludes those for which treatment or advice were obtained within the designated period prior to the effective date of the policy, the court concludes that plaintiff could not have received treatment or advice *"for"* a condition unless some awareness of the actual condition existed.

Unlike the court in *Hughes,* this court also sits as the fact-finder in this case. The court finds that CNA presented no evidence at trial to rebut the presumption favoring the insured in connection with the interpretation of the contract language. CNA's sole witness, Dr. Cooper, testified regarding the medical treatment given to plaintiff. Dr. Cooper's testimony did not relate to the interpretation of the language in the contract.

---

6. The policy at issue in *Mannino* defined "pre-existing condition" as "one for which medical advice was given, treatment was recommended by or received from a health care provider ... within 12 months before [the insured was] covered by this contract." *Mannino,* 600 N.Y.S.2d at 725.

During closing arguments, CNA's counsel did argue that public policy supports CNA's interpretation, and that under plaintiff's interpretation "you would thereby be encouraging people to delay diagnosis, so that they could be diagnosed after an effective date of insurance." July 7 TT. at 36. Of course, counsel's argument at closing does not constitute evidence in the case. Moreover, when called upon to interpret contract provisions, unless unusual circumstances exist, which are not present here, the court is to give effect to the words which denote the bargain, not to effectuate public policy. See *Burnham v. Guardian Life Ins. Co.,* 873 F.2d 486 (1st Cir.1989). In any event, if CNA's logic were followed, its interpretation of the contract language would arguably inhibit people from seeking *any* medical advice—not just a diagnosis—regarding health problems during the policy's probationary period. This is not a public policy to be followed. CNA's argument also assumes that doctors are willing conspirators who might readily give advice and treat a potentially debilitating disease without first making a diagnosis. The court does not believe: this to be the case.[7]

### Factual Findings

All that remains is to apply the accepted interpretation of the contract language to the facts at hand. As discussed above, CNA concedes that the lump in plaintiff's breast was not diagnosed as being cancerous until after the effective date of the policy. Based upon all of the evidence and testimony presented at trial, the court finds that neither Dr. Ruh, nor Dr. Apen, advised or treated plaintiff for a cancerous condition—or even seriously considered the possibility that the lump in plaintiff's breast was cancerous—prior to April 1, 1991. Thus, the court finds that plaintiff did not receive medical treatment or advice during the probationary period for a pre-existing condition which caused plaintiff's disability.

7. Notwithstanding, the court places no reliance upon public policy issues as the basis for the

### Conclusion

As discussed above, upon all the evidence introduced at trial, the court finds that a pre-existing condition did not negate coverage regarding plaintiff's disability and that CNA improperly denied plaintiff's long-term disability benefits under the policy at issue in this case.

It is the court's understanding that prior to trial the parties substantially agreed as to the monetary amount due to plaintiff under the policy if the court found in plaintiff's favor. If such an agreement exists, the parties are hereby directed to submit a stipulated judgment to the court for signature. If the parties can not agree as to the amount of damages, the parties are to notify the court that further judicial intervention is required.

So Ordered.