489 F.3d 405
 Joseph H. REINHARDT, J.D., Cross-Appellant.
EIU Group, Inc., Plaintiff-Appellee/Cross-Appellant,
James W. Broderick; John R. Stamatov; Environmental Insurance Underwriters Agency, Inc.; Environmental Capital Insurance Brokerage, Inc., Plaintiffs,
v.
GULF INSURANCE COMPANY; Citibank Delaware, Inc.; Kent Ziegler, Defendants-Appellants/Cross-Appellees,
Gulf Underwriters Insurance Company; Gulf Group Lloyds; Select Insurance Company; Atlantic Insurance Company, Defendants.
 No. 06-1932.
 No. 06-1933.
 No. 06-1934.
 No. 06-1935.
 United States Court of Appeals, First Circuit.
 Heard February 9, 2007.
 Decided June 11, 2007.
 
 Thomas R. Kiley, with whom Cosgrove, Eisenberg & Kiley, P.C. was on brief, for cross-appellant.
 Allen N. David, with whom Terri L. Pastori and Peabody & Arnold LLP, were on brief, for defendants-appellants/cross-appellees.
 Joseph H. Reinhardt, J.D., with whom Edwin A. McCabe, was on brief, for plaintiff-appellee/cross-appellant.
 Before TORRUELLA, Circuit Judge, STAHL, Senior Circuit Judge, and HOWARD, Circuit Judge.
 TORRUELLA, Circuit Judge.
 
 
 1
 EIU Group, Inc. ("EIUG") filed this lawsuit against Gulf Insurance Company ("Gulf"), Citibank Delaware, Inc. ("Citibank"), and Kent Ziegler (collectively, "Appellants") alleging that Ziegler breached his fiduciary duties to EIUG, thereby causing the company financial detriment. Gulf filed a counterclaim alleging breach of a $1.5 million promissory note. The case went to trial and the jury found that Ziegler had breached his fiduciary duty to EIUG, that Citibank was vicariously liable for Ziegler's conduct, and that Gulf was not entitled to recover on its counterclaim. The jury awarded damages to EIUG and noted on the verdict slip that Ziegler and Citibank were to pay 100% of EIUG's legal fees. Judgment was entered against Ziegler and Citibank for the damages awarded by the jury, but not for any amount of attorney's fees.
 
 
 2
 All parties filed timely post-trial motions: EIUG to alter or amend the judgment by adding attorney's fees and to vacate the previous dismissal of EIUG's claim under Mass. Gen. Laws ch. 93A; Ziegler, Citibank, and Gulf for judgment as a matter of law and for a new trial. The district court denied all motions and Appellants and EIUG now appeal. In addition, Joseph Reinhardt, the attorney representing EIUG at trial, appeals from the district court's imposition of a Rule 11 sanction. After careful consideration, we affirm the district court's Rule 11 sanction and its denial of EIUG's motions to alter or amend the judgment and to vacate. We reverse the court's denial of Appellants' motions for judgment as a matter of law and remand for further proceedings consistent with this opinion.
 
 I. Facts
 
 3
 On June 3, 1999, James Broderick and John Stamatov entered into an agreement with Gulf to develop, underwrite, and sell environmental insurance policies issued by Gulf. This agreement, as embodied in a Plan of Organization (the "Plan"), provided for the formation of EIUG as a holding company with two subsidiaries, Environmental Capital Insurance Brokerage, Inc. ("ECIB") and Environmental Insurance Underwriters Agency, Inc. ("EIUA"). ECIB was a company Broderick and Stamatov formed in 1997 to broker environmental insurance policies. Under the Plan, ECIB was to continue its role as a broker, selling environmental insurance issued by a number of companies, including Gulf. The Plan provided for the organization of EIUA as a program manager for Gulf. In this role, EIUA was to develop, sell, and underwrite Gulf environmental insurance products. Gulf and EIUA entered into a Program Manager's Agreement (the "PMA") under which the parties agreed that Gulf was responsible for obtaining reinsurance for the insurance products EIUA developed. The PMA also provided that Gulf had to approve any materials before they could be used to advertise Gulf insurance products.
 
 
 4
 As start-up capital for EIUG, Broderick and Stamatov contributed all of their interest in ECIB stock. Citibank, a Gulf affiliate, contributed $500,000. Thus, Broderick and Stamatov together owned 68.75% of the EIUG stock and Citibank owned 31.25%. Broderick, Stamatov, and Citibank entered into a Stockholders Agreement (the "Agreement") allowing each of the three shareholders to nominate a director who had to be elected unanimously. Broderick and Stamatov nominated themselves for the director positions, and Citibank nominated Kent Ziegler, the Chief Financial Officer and an executive vice president at Gulf. The Agreement also provided that most major corporate decisions — declaring dividends, borrowing money, employing officers, etc. — had to be unanimous.
 
 
 5
 The first product Broderick and Stamatov developed was called Terraguard, an environmental insurance policy designed for owners of low-risk properties. Gulf retained James Cincotta, a reinsurance specialist, to obtain reinsurance for this policy. By the spring of 1999, a reinsurance treaty was in place, and EIUA began selling Terraguard policies.
 
 
 6
 Terraguard did not sell well. Each month the company suffered losses until, in December 1999, EIUG became insolvent. By the beginning of 2000, Broderick viewed Terraguard as essentially unsalable.
 
 
 7
 Given these financial problems, EIUG approached Gulf for a loan in January 2000. Initially, Gulf made an interim loan of $25,000. On January 21, 2000, Gulf loaned EIUG $1.5 million. Under the promissory note for the $1.5 million loan (the "Promissory Note"), EIUG agreed to a repayment plan under which interest payments were due on January 21 and July 21 of each year, and the entire principal balance was due on January 21, 2005. In addition, the Promissory Note specified that EIUG would be considered in default if it became insolvent. In the event of a default, the Promissory Note provided that Gulf could, by written notice, declare the principal and accrued interest immediately due and payable. The Promissory Note also provided that EIUG would be responsible for attorney's fees and costs incurred in attempting to seek repayment.
 
 
 8
 Using the loaned money, Broderick and Stamatov developed a new product line called Millenious, consisting of three new policies. The first was a property owner's policy on low-risk properties that was very similar to Terraguard. The second was a pollution legal liability policy for high-risk properties. The third was a secured creditors policy, which insured lenders against the risk that property held as collateral would become polluted while the borrowers were in default. At the outset, only the property owner's policy had reinsurance because it was reinsured under the Terraguard reinsurance treaty.
 
 
 9
 Gulf again retained James Cincotta to obtain the needed reinsurance for the other Millenious policies. This time, the potential reinsurers raised questions about the insurance products. In particular, the reinsurers raised underwriting concerns about the risk and profitability of the policies given their monetary limits and anticipated terms. Broderick felt that the secured creditors policy would not be profitable unless it could be issued for up to $10 million and for a period of up to twenty years, but the reinsurers were hesitant to reinsure a policy for more than $4.5 million or for longer than fifteen years. Negotiations between Broderick and the reinsurers lasted until mid-June 2000. The reinsurance was in place by July 1, 2000. During this process, Ziegler did not try to do anything that could expedite the reinsurance process.
 
 
 10
 Thereafter, Broderick and Stamatov began trying to sell the policies. In late July 2000, Gulf acquired the renewal rights to United Capitol's casualty and environmental insurance policies, which were arguably in direct competition with EIUG's business. As CFO of Gulf, Ziegler was involved in this transaction, but he did not tell Broderick or Stamatov about it, nor did he do anything to prevent it from taking place.
 
 
 11
 Broderick testified that soon after this acquisition, Gulf withheld approval of Broderick and Stamatov's advertising campaign for the Millenious products. Ziegler did not intervene on EIUG's behalf to try to get advertising approval from Gulf.
 
 
 12
 Ultimately, Millenious was no more successful than Terraguard. On December 18, 2000, Broderick, Stamatov, EIUG, and EIUA filed a complaint against Gulf, Citibank, and Kent Ziegler. On April 11, 2001, the plaintiffs moved to amend the Complaint by adding ECIB as a plaintiff. The Amended Complaint alleged, among other claims, that Ziegler, in breach of his fiduciary duty, had caused the demise of EIUG by failing to act on its behalf to (1) expedite the reinsurance process for the Millenious products, (2) lift the hold on advertising, and (3) prevent the acquisition of the United Capitol insurance rights or allow some form of participation in the transaction. The defendants answered, and Gulf counterclaimed alleging breach of the $1.5 million promissory note and unjust enrichment.
 
 
 13
 The parties filed a series of summary judgment motions, which resulted in two opinions by the district court. On July 9, 2003, the district court dismissed without prejudice EIUG's claim for attorney's fees pursuant to Mass. Gen. Laws ch. 93A for Ziegler's breach of fiduciary duty. On November 9, 2004, the court issued a second memorandum and order dismissing Gulf's claim for unjust enrichment.
 
 
 14
 On June 2, 2004, Appellants filed a motion to confirm that certain claims were dismissed by the district court on summary judgment. Along with the motion, the defendants alleged that EIUG's counsel, Joseph Reinhardt, had refused to enter into good faith negotiations over a stipulation for what a docket entry should read, forcing them to file a motion and incur significant litigation costs. In support of their contention, the defendants submitted an email exchange between counsel wherein Reinhardt responded to the defendants' first proposed stipulation saying, "For reasons that should be obvious to all of you, my response to the request to enter into a FRCP dismissal is NO.... Try again, if you want to." After the second proposed stipulation, Reinhardt faulted the defense counsel for not "figur[ing] out [his] concerns," and stated that Appellants' counsel should file a motion and consider the exchange as satisfying the obligation to confer.
 
 
 15
 The district court held that Reinhardt violated Rule 11 and noted that "[t]he abundant time, energy, and paper taken by the filing of the original motion and the resulting litigation over costs might have been avoided if Reinhardt had simply stated his objections to the proposed stipulations or provided a response draft."
 
 
 16
 Trial began on November 28, 2005. Three issues were submitted to the jury: Whether Ziegler had breached his fiduciary duty to EIUG, whether Citibank was vicariously liable for Ziegler's actions, and whether EIUG had breached its obligations under the Promissory Note.
 
 
 17
 In a general verdict, the jury found that Ziegler had breached his fiduciary duty and that Citibank was vicariously liable for Ziegler's conduct. It awarded $654,585 in damages. The jury also found that Gulf was not entitled to recover on its counterclaim. Finally, the jury noted on the verdict slip that Ziegler and Citibank were to pay EIUG's legal fees.
 
 
 18
 The district court entered a judgment against Ziegler and Citibank for $654,585 in damages, but denied EIUG attorney's fees. EIUG filed a motion to alter or amend the judgment by adding attorney's fees pursuant to the jury verdict and, in the alternative, a motion to vacate the previous dismissal of the Chapter 93A claim for attorney's fees. Ziegler, Citibank, and Gulf also filed post-trial motions asking for judgment as a matter of law or for a new trial. The district court denied all post-trial motions.
 
 II. Discussion
 
 A. Breach of Fiduciary Duty
 
 
 19
 Appellants argue that the district court erred in denying their motion for judgment as a matter of law because EIUG did not produce sufficient evidence to establish that Ziegler breached his fiduciary duty to EIUG or that such a breach would have caused any harm to EIUG. We review the district court's denial of the Rule 50 motion de novo, examining the evidence in the light most favorable to the nonmovant, EIUG. Golden Rule Ins. Co. v. Atallah, 45 F.3d 512, 516 (1st Cir.1995). We will reverse "only if the facts and inferences `point so strongly and overwhelmingly in favor of the movant' that a reasonable jury could not have reached a verdict against that party." Id. at 516 (quoting Acevedo-Diaz v. Aponte, 1 F.3d 62, 66 (1st Cir.1993)); see also Fed. R.Civ.P. 50(a)(1) ("If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.").
 
 
 20
 Directors of business corporations are fiduciaries who "must place their management of corporate affairs above their purely personal concerns." Brown v. Little, Brown & Co., 269 Mass. 102, 168 N.E. 521, 528 (1929). They may be held liable for a violation of this duty, where the violation results in "impairment of assets, or injury to [the corporation's] property, or unlawful profit to themselves." United Zinc Cos. v. Harwood, 216 Mass. 474, 103 N.E. 1037, 1038 (1914).
 
 
 21
 As the plaintiff in an action for breach of fiduciary duty, EIUG had the burden at trial of establishing a causal connection between Ziegler's alleged breach of fiduciary duty and the injury sustained by EIUG. See Hanover Ins. Co. v. Sutton, 46 Mass.App.Ct. 153, 705 N.E.2d 279, 280 (1999). "This connection cannot be left to the jury's conjecture or speculation"; that is, "it is not enough to show the mere possibility of a causal connection; the probability of such a connection must be shown." Jorgensen v. Mass. Port Auth., 905 F.2d 515, 524 (1st Cir.1990) (citing Berardi v. Menicks, 340 Mass. 396, 164 N.E.2d 544, 546-47 (1960)). Under Massachusetts law, a plaintiff seeking to establish causation must show that the "defendant's conduct was a but-for cause of [its] injury, and that [the] defendant's conduct was a `substantial legal factor' in bringing about the alleged harm to [the] plaintiff." Id. (citing Wallace v. Ludwig, 292 Mass. 251, 198 N.E. 159, 161 (1935); Tritsch v. Boston Edison Co., 363 Mass. 179, 293 N.E.2d 264, 267 (1973)).
 
 
 22
 EIUG presented to the jury three possible bases upon which to find a breach of fiduciary duty: Ziegler's inaction with respect to (1) EIUG's efforts to obtain reinsurance for the Millenious products; (2) the advertising hold that Gulf had imposed on EIUG in July 2000; and (3) Gulf's acquisition of the renewal rights to United Capitol's environmental insurance business. EIUG's general theory of liability at trial was that Ziegler had influence in Gulf's decision-making, which he did not use to encourage Gulf to take a more aggressive reinsurance position or to intervene to lift the advertising prohibition, and that he participated in Gulf's decision to acquire competing environmental insurance products without telling EIUG about that transaction or inviting it to participate in the United Capitol acquisition. We find that, even assuming that Ziegler breached his fiduciary duties, EIUG's claim for breach of fiduciary duty fails as a matter of law because EIUG failed to present sufficient evidence that such breach caused harm to EIUG.
 
 
 23
 With respect to the reinsurance issue, there was no evidence submitted to the jury that any influence exerted by Ziegler would have expedited the reinsurance process. The only evidence relevant to causation was testimony that some reinsurers are sometimes subject to influence by third parties. This is insufficient to establish even a reasonable likelihood that Ziegler had any influence or that such influence, if exerted, would have expedited the reinsurance process. In fact, the evidence presented was that Ziegler was not responsible for reinsurance decisions and that he could not have dictated the terms of any reinsurance treaty.
 
 
 24
 With respect to the advertising issue, EIUG did not present sufficient evidence that any action taken by Ziegler would have changed the outcome of the advertising ban. EIUG does not dispute that Ziegler was not in charge of advertising decisions; it only presented evidence that he was "involved" in the process insofar as he agreed to talk to Steven Zeitman, Executive Vice President at Gulf and Ziegler's superior, about the advertising prohibition. Such evidence cannot support a jury finding that, if Ziegler had lobbied on EIUG's behalf, as EIUG suggests, this act would have affected Gulf's ultimate decision and would have lifted the advertising ban.
 
 
 25
 Finally, with respect to the United Capitol renewal rights acquisition issue, there is insufficient evidence that Ziegler's actions, or omissions, caused EIUG's injuries. First, to the extent that EIUG argued that Ziegler breached his fiduciary duties by not lobbying on its behalf to stop the acquisition, EIUG did not present sufficient evidence to support a rational jury's conclusion that any lobbying by Ziegler could have halted such a transaction. The only evidence EIUG presented in support of this argument was that Ziegler worked under Christopher Watson, Gulf's president and the person who had the ultimate authority to decide whether to purchase the United Capitol renewal rights. Watson testified that he made that decision "with the help of [his] team." This statement does not establish the extent of Ziegler's influence in that decision-making process. He may have "help[ed]" as part of a team, but that alone is insufficient to establish that he had the power to alter the ultimate decision; EIUG did not show that any exercise of Ziegler's influence on behalf of EIUG would have resulted in a decision by Gulf to forego the opportunity to acquire the renewal rights.
 
 
 26
 EIUG also argued that Ziegler breached his fiduciary duties by not informing Broderick or Stamatov of the acquisition of the renewal rights before that transaction was made public. But EIUG presented insufficient evidence that any injury was caused by this delay in information. In fact, Broderick testified that "[he was] not sure exactly what [EIUG] would have done" had it known about the transaction earlier. There is no evidence of concrete or even probable loss to EIUG resulting from Ziegler's failure to tell Broderick or Stamatov about the transaction. EIUG did not show that it could or would have done anything different that would have avoided the losses EIUG incurred.
 
 
 27
 Finally, EIUG argued to the jury that Ziegler should have lobbied for EIUG to be invited to participate in the transaction. But again EIUG failed to present any evidence of the extent of Zeigler's ability to influence Gulf's decision on this issue. Moreover, there was no evidence of what form its participation would have taken even if Gulf had agreed to EIUG's participation, nor was there evidence indicating that the financial outcome for EIUG would have been better had it participated in the acquisition of United Capitol's renewal rights.
 
 
 28
 In its appellate brief, EIUG does not point to evidence of causation. Instead, it points out that Appellants made these arguments on summary judgment and lost. EIUG argues that because the district court found that there were enough facts on the summary judgment record to allow a reasonable jury to find for them on these same issues, and because those same facts were presented at trial, "it is only consistent and appropriate to rule that the evidence entered at trial is sufficient to withstand a judgment as a matter of law."
 
 
 29
 But looking to the district court's summary judgment decisions does not help EIUG. On summary judgment, the court found that causation was satisfied because
 
 
 30
 taking the facts in the light most favorable to the plaintiff, a reasonable jury could find that Ziegler had influence in Gulf's decision making, Ziegler did not investigate and intervene in the advertising prohibition; Ziegler participated in Gulf's decision to acquire competing environmental products and did not tell EIUG about the impending transaction; and Ziegler did not adequately support EIUG after the United Capitol acquisition. EIUG has provided expert testimony indicating that the delay in locating reinsurance, the advertising prohibition, the purchase of United Capitol, and the subsequent management issues resulted in losses to EIUG.
 
 
 31
 These facts, however, are insufficient to establish causation. The district court essentially found that EIUG presented evidence that Ziegler had influence in Gulf's decision-making, that he did not exercise this influence on behalf of EIUG, and that the reinsurance delay, the advertising ban, and the renewal rights purchase harmed EIUG. Significantly, the district court was silent as to whether there was evidence that had Ziegler exerted any influence, reinsurance would have been expedited, the advertising ban would have been lifted, or the United Capitol renewal rights acquisition would not have proceeded just as it did. That is, the district court found that EIUG presented evidence of breach and harm, but it did not cite to any evidence that the breach caused the harm. Because EIUG has not demonstrated that Ziegler's actions caused the company any harm, we hold that the district court erred in denying Appellants' Rule 50 motion for judgment as a matter of law.[1] In light of this holding, we also find that Appellants are entitled to judgment as a matter of law on the question of Citibank's vicarious liability for Ziegler's conduct.
 
 
 32
 
 B. Gulf's Counterclaim: Breach of Promissory Note
 
 
 
 33
 Appellants argue that the district court erred in denying Gulf's motion for judgment as a matter of law on its claim for breach of the Promissory Note. We review the court's denial of the Rule 50 motion de novo, examining the evidence in the light most favorable to the nonmovants. Atallah, 45 F.3d at 516.
 
 
 34
 Under the Note, Gulf was required to loan EIUG $1.5 million at 11% interest. EIUG, in turn, was required to repay the loan, making interest payments twice a year, each year, until January 15, 2005, at which time the principal balance would be due. Gulf performed its obligation, but EIUG never repaid the loan. It is undisputed that EIUG received the proceeds of the $1.5 million loan, that it made one interest payment of $82,500, and that it never made any other interest payments or payment of the principal. EIUG's sole defense for non-payment at trial and on appeal is that Gulf breached the covenant of good faith and fair dealing.
 
 
 35
 Under New York law,[2] every contract includes an implied covenant of good faith and fair dealing. This implied covenant "embraces a pledge that `neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 639 N.Y.S.2d 977, 663 N.E.2d 289, 291 (1995) (quoting Kirke La Shelle Co. v. Paul Armstrong Co., 263 N.Y. 79, 188 N.E. 163, 167 (1933)). "[H]owever, the implied covenant does not extend so far as to undermine a party's `general right to act on its own interests in a way that may incidentally lessen' the other party's anticipated fruits from the contract.'" M/A-COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir.1990) (quoting Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co., 30 N.Y.2d 34, 330 N.Y.S.2d 329, 281 N.E.2d 142, 145 (1972), cert. denied, 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972)).
 
 
 36
 EIUG does not point to any misconduct on Gulf's part in support of its argument. Instead, EIUG argues that because Ziegler was Gulf's Chief Financial Officer and executive vice president during the time at issue, Ziegler may be considered Gulf's agent. As such, EIUG argues that Ziegler's "wrongdoing, in advancing Gulf's interest at the expense of EIUG, is fully attributable to Gulf." EIUG goes on to cite the reinsurance, advertising hold, and acquisition of United Capital issues to establish that Gulf — through Ziegler — engaged in "nefarious actions," thus breaching the implied covenant of good faith and fair dealing.
 
 
 37
 Appellee's argument fails because (among other reasons) Gulf never owed EIUG any fiduciary duties. Ziegler's wrongdoing, assuming there was any, stems from his personal duties to EIUG as a director in the company. He was nominated and voted into the position as an individual, not as Gulf's agent; Gulf was never a director in EIUG. EIUG's vicarious liability theory, therefore, rests only on the fact that Ziegler was employed by Gulf.
 
 
 38
 It is a basic principle of tort law that vicarious liability will only be imputed to an employer if the tort was committed within the scope of employment. Davis v. Larhette, 39 A.D.3d 693, 834 N.Y.S.2d 280, 283 (2007) ("An employer is vicariously liable for its employees' torts under the theory of respondent superior if the acts were committed while the employee was acting within the scope of his employment. An act is considered to be within the scope of employment if it is performed while the employee is engaged generally in the business of his employer, or if his act may be reasonably said to be necessary or incidental to such employment"). In performing his duties as director of EIUG (or in failing to, for that matter), Ziegler was not acting as Gulf's employee; he was acting as a director of EIUG — two separate and distinct jobs. Therefore Ziegler's alleged wrongdoing — his breach of fiduciary duties — cannot be imputed to Gulf.
 
 
 39
 Because Gulf set forth undisputed documentary evidence that EIUG executed the Promissory Note, received the benefits thereof, and failed to make payment, Gulf is entitled to judgment as a matter of law on the breach of Promissory Note claim. See Gateway State Bank v. Shangri-La Private Club for Women, Inc., 113 A.D.2d 791, 493 N.Y.S.2d 226, 227 (N.Y.App.Div.1985), aff'd., 67 N.Y.2d 627, 499 N.Y.S.2d 679, 490 N.E.2d 546 (1986). We therefore reverse the district court's denial of Appellants' Rule 50 motion, and remand for a calculation of damages.
 
 
 C. Attorney's Fees
 
 
 40
 On cross-appeal, EIUG argues that the district court erred in denying EIUG's post-trial motions (1) to vacate the dismissal, without prejudice, of the Chapter 93A claims and (2) to alter and amend the judgment by adding attorney's fees pursuant to the jury's verdict.
 
 
 41
 We need not reach the merits of Appellee's arguments for a grant of attorney's fees because, in light of our holding that EIUG's breach of fiduciary claim fails as a matter of law, EIUG cannot be considered a successful plaintiff, and is therefore not entitled to attorney's fees under any legal theory. See Fascione v. CNA Ins. Cos., 435 Mass. 88, 754 N.E.2d 662, 668 (2001) ("A successful party under [Chapter] 93A, § 9[ (3)-(4)], can recover multiple damages, costs, and attorney's fees, as well as other equitable relief deemed necessary and proper." (emphasis added)); Cordeco Dev. Corp. v. Santiago Vasquez, 539 F.2d 256, 262 (1st Cir.1976) ("At common law attorney's fees are not compensable damages, nor are they the appropriate measure of punitive damages. Support for [a] district court's award of attorney's fees, then, can only be found, in the absence of an applicable statute, in the traditional equitable power to award fees when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." (internal quotation marks and citations omitted) (emphasis added)). We therefore affirm the district court's denial of EIUG's post-trial motions.
 
 
 D. Rule 11 Sanctions
 
 
 42
 EIUG's trial and appellate counsel, Joseph Reinhardt, argues that the district court abused its discretion in imposing a Rule 11 sanction of ten hours of pro bono service based on Reinhardt's refusal to enter into negotiations over a stipulation. We review a district court's decision to impose Rule 11 sanctions for abuse of discretion, and any findings of fact supporting that decision for clear error. Obert v. Republic W. Ins. Co., 398 F.3d 138, 143 (1st Cir.2005). "Because the imposition of sanctions is peculiarly within the province of the court in which the challenged conduct occurs, a party complaining to an appellate tribunal in respect to trial-level sanctions `bears a heavy burden of demonstrating that the trial judge was clearly not justified in entering [the] order.'" Anderson v. Beatrice Foods Co., 900 F.2d 388, 393 (1st Cir.1990) (quoting Spiller v. U.S.V. Labs., Inc., 842 F.2d 535, 537 (1st Cir.1988) (alteration in original)).
 
 
 43
 Reinhardt argues that the district court's imposition of Rule 11 sanctions on the ground that Reinhardt was "evasive" in a dispute over the clarification of the record and that his conduct needlessly increased the cost of litigation was an abuse of discretion. Reinhardt claims that his conduct in refusing to enter into a stipulation regarding the docket entry was justified due to "his prior experience with the defendants' difficult conduct in the case, their attempts to seek unfair advantage and Reinhardt's duty to his clients of zealous advocacy which included a preservation of his clients' appellate rights." Reinhardt also argues that his conduct could not have been needlessly contentious given that the district court ultimately adopted the language he proposed in his motion.
 
 
 44
 Under Rule 11, a written motion must "not be [] presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." Fed.R.Civ.P. 11(b)(1). The district court specifically found that Reinhardt had unnecessarily increased litigation costs when he "refused to engage in meaningful discussion and relied on defense counsel to intuit his objections." This finding is not clearly erroneous: In response to opposing counsel's proposed stipulations, Reinhardt first stated, "For reasons that should be obvious to all of you my response to the request to enter into a FRCP dismissal is NO.... Try again, if you want to." And after the second proposed stipulation, Reinhardt responded with,
 
 
 45
 Giving you guys the benefit of the doubt, you still haven't figured out my concerns. Rather than continue this game of 20 questions, why don't you go ahead and file your motion — consider the exchange of e-mail to have satisfied the ... obligation to confer — and I'll review it and respond as appropriate.
 
 
 46
 In view of these facts, we find that the district court was justified in its decision to impose sanctions. The fact that the district court ultimately adopted Reinhardt's proposed language does not alter our conclusion. The district court did not fault Reinhardt for misstating facts or law, rather it reprimanded him for unnecessarily "forcing defendants to litigate the issue" and "tak[ing] up court time and consequently burden[ing] other individuals' rights to come before [the] court in a timely manner to have their issues litigated." Had Reinhardt proposed that language in response to the defendants' attempts at negotiation, the need for motion practice likely would have been obviated.
 
 
 47
 Moreover, it is important to bear in mind that the sanction imposed was an obligation to perform ten hours of pro bono service. This sanction is not out of proportion to the violation. See Obert, 398 F.3d at 146 (finding that $30,000 award in attorneys' fees as a Rule 11 sanction was not supported, but noting that "had [the court] invoked Rule 11 and required a small payment to plaintiffs counsel for having to write a response, this might well have passed muster under an abuse of discretion standard"). Thus, we affirm the district court's imposition of Rule 11 sanctions.
 
 III. Conclusion
 
 48
 For the reasons stated above, we affirm the district court's denial of EIUG's motions to vacate and to alter or amend the judgment, as well as the district court's imposition of a Rule 11 sanction. However, we reverse the district court's denial of Appellants' Rule 50 motions for judgment as a matter of law with respect to the breach of fiduciary duty and breach of promissory note claims, and remand for further proceedings consistent with this opinion.
 
 
 49
 Affirmed in part and reversed and remanded in part.
 
 
 50
 As to the appeal and cross-appeal of the district court's ruling on the post-trial motions, costs shall be taxed against the appellee. As to the appeal of the district court's imposition of Rule 11 sanctions, costs shall be taxed against the appellant.
 
 
 
 Notes:
 
 
 [1]
 Because we find that Appellants are entitled to judgment as a matter of law on the breach of fiduciary duty claim, we need not address Appellants' other arguments of error on that claim
 
 
 [2]
 The Promissory Note provides that it is governed by New York law on all matters, except as to the legality of the interest rate, and neither party contests the applicability of New York law