**SEGUROS CARACAS DE LIBERTY MUTUAL, S.A., Plaintiff,**

v.

**GOLDMAN, SACHS & CO., Defendant.**

No. CIV.A. 06–10035–WGY.

United States District Court,
D. Massachusetts.

July 27, 2007.

John R. Baraniak, Jr., Choate, Hall & Stewart, Boston, MA, for Seguros Caracas de Liberty Mutual, S.A., Plaintiff.

William F. Abely, II, John D. Donovan, Jr., Ropes & Gray, LLP, Boston, MA, Michael Thomas Marcucci, Hanify & King, P.C., Boston, MA, for Goldman Sachs & Co., Defendant.

Peter B. Moores, Michael A. Walsh, Choate, Hall & Stewart, Boston, MA, for Seguros Caracas de Liberty Mutual, S.A., Plaintiff.

### MEMORANDUM AND ORDER

YOUNG, District Judge.

In 2001, Seguros Caracas de Liberty Mutual, S.A. ("Liberty Mutual") placed a

series of orders for Venezuelan bonds with Goldman, Sachs & Co. ("Goldman"). At that time, the bonds traded along with attached Venezuelan Oil Obligation Securities ("VOOs"). When Liberty Mutual placed the orders, VOOs were hard to obtain. Goldman had significant difficulty delivering the VOOs and ultimately was able to deliver the VOOs for only two of the twelve orders that Liberty Mutual placed. Goldman concedes that it breached the contracts to deliver VOOs. The parties disagree, however, when that breach took place. The date of the breach is of monumental importance because the VOOs skyrocketed in value between 2001, when they were virtually worthless, and 2005, when they sold for $27 per unit.

## I. PROCEDURAL BACKGROUND

On January 6, 2006, Liberty Mutual initiated the instant action against Goldman. In the Complaint [Doc. No. 1], Liberty Mutual asserted a single count for breach of contract. On February 28, 2006, Goldman filed its Answer [Doc. No. 6]. On January 12, 2007, Liberty Mutual moved to amend the complaint to add a claim for violation of Massachusetts General Laws, chapter 93A [Doc. No. 22]. This Court denied the motion on February 14, 2007 as untimely.

On the same day that Liberty Mutual moved to amend the complaint, Goldman moved for summary judgment [Doc. No. 27]. This Court denied the motion following oral argument on February 23, 2007. Trial commenced on May 7, 2007 and ran for seven days. On May 18, 2007, the jury returned a verdict finding that the date of the breach was November 15, 2005 and that the price of a single VOO was $27 on that date. This Court then ruled that Liberty Mutual was not entitled to dividends paid out prior to that date.

Goldman subsequently filed a motion for judgment as matter of law or for a new trial [Doc. No. 96]. Liberty Mutual moved to amend the judgment to include the dividend payments [Doc. No. 97]. These two motions are the subject of this memorandum.

## II. FACTUAL BACKGROUND

The facts are presented below in the light most favorable to the jury verdict. *See, e.g., Rivera Castillo v. Autokirey, Inc.,* 379 F.3d 4, 9 (1st Cir.2004).

### 1. The Venezuelan Oil Obligation Securities

VOOs entitle holders to receive semiannual payments from Venezuela during a twenty-four year period from April 15, 1996 until April 15, 2020. The amounts of these payments are calculated in accordance with a prescribed formula that reflects the amount by which the average price of Venezuelan crude oil exports during incremental twelve-month periods exceeds a stipulated "strike price," subject to a cap of $3 per VOO. The strike price applicable to the calculation of the first payment was $26 per barrel; thereafter the strike price has been adjusted for inflation. So long as Venezuelan crude oil is sold on world markets for less than the strike price, the VOO holder is not entitled to receive any payment from Venezuela. May 11 Tr. at 46:25–47:20, 114:18–16.

Venezuela did not issue VOOs as standalone securities. Rather, Venezuela attached the VOOs to par bonds and discount bonds. *Id.* at 46:19–22. Although by their terms, VOOs could be detached from the associated bonds at the option of the holder and transferred separately beginning in 1990, industry practice recommended otherwise. The Emerging Markets Trading Association (the "Association"), an organization of broker-dealers and buy/sell participants who trade in emerging market securities, recom-

mended that although VOOs were eligible to trade separately, the bonds and VOOs should trade together. This meant that when the purchase or sale of bonds was ordered, broker-dealers such as Goldman would simultaneously enter a separate trading order and require separate settlement instructions for the associated VOOs, whether they were specifically ordered or not. In December 2001, the Association changed its recommendation to suggest that VOOs trade separately. This recommendation was effective for trades made on and after January 2, 2002. *Id.* at 48:8–13, 108:25–110:12; May 14 Tr. at 59:1–2.

VOOs were "out of the money" until 2004, when Venezuelan crude oil sold on world markets for more than the strike price. Venezuela paid the maximum $3 dividend to holders of VOOs in April 2005 and again in October 2005. May 11 Tr. at 83:2–19.

## 2. Liberty Mutual's Securities Orders

Prior to Liberty Mutual's first purchase in 2001 of a Venezuela bond that traded with VOOs, Liberty Mutual was aware that certain broker-dealers were having difficulty obtaining delivery of VOOs. *Id.* at 51:4–23; 58:8–18. Liberty Mutual therefore made it a policy to obtain verbal assurances from broker-dealers that they would make delivery of the corresponding VOOs in connection with trades executed by Liberty Mutual for Venezuelan bonds. Recognizing the difficulty that broker-dealers were having obtaining VOOs, Liberty Mutual did not require broker-dealers to assure Liberty Mutual that they could make delivery of VOOs on the settlement date for each trade, or within any other specific period of time. Goldman was made aware of this policy and provided the requested assurances to Liberty Mutual. *Id.* at 61:7–13, 76:3–16, 144:9–145:14; May 14 Tr. at 43:8–24.

On January 9, 2001, Liberty Mutual placed an order with Goldman to purchase units consisting of Venezuelan bonds and 22,000 corresponding VOOs. May 11 Tr. at 66:6–9. Goldman delivered the bonds on the settlement date but was not able to deliver the VOOs on that date because it encountered difficulties obtaining those securities. *Id.* at 66:24–67:7. After Liberty Mutual pressed for delivery of the VOOs, Goldman stated that it was working on getting VOOs to make delivery but that it would take a long time. Ultimately, Goldman was able to deliver the securities following internal worries about being in the "permabox." May 15 Tr. at 82:24–84:19.

Thereafter, in February 2001, Goldman approached Liberty Mutual about a potential sale of additional Venezuelan bonds to Liberty Mutual's clients. Goldman confirmed that it would not sell those bonds to Liberty Mutual's clients if it could not also commit to delivering VOOs that traded with the bonds. *Id.* at 84:24–87:3. Pursuant to this solicitation, Liberty Mutual purchased bonds and VOOs from Goldman in eleven separate trades between June 6, 2001 and December 13, 2001.

The January 9 and June 6 trades were the only times that Goldman actually delivered VOOs. May 11 Tr. at 117:9–118:12. After Liberty Mutual placed its third order on June 28, there was friction within Goldman after a broker promised VOOs without first clearing it with a higher-up. The broker had stated that Liberty Mutual had threatened to cut off all business unless VOOs were delivered. The broker expressed a hope that "our secret reserve exists as this will cause a MAJOR problem with this client." May 15 Tr. at 95:11–96:4. The higher-up stated that Goldman had delivered the VOOs in the past "because we had to .... I'm not really interested in doing it again (including this trade)." *Id.* at 99:24–100:9. Goldman did

not deliver VOOs for this trade, even though it had enough to fulfill that order, or for any of the subsequent trades that Liberty Mutual made. *Id.* at 95:11–103:19. Despite the higher-up's disavowal, Goldman did not communicate to Liberty Mutual in 2001 that it would not be delivering the VOOs. Liberty Mutual continued to place orders for VOOs and Goldman failed to deliver the aggregate amount of 220,375 VOOs. May 11 Tr. at 74:4–14.

In early 2002, Liberty Mutual contacted Goldman to inquire about the status of Goldman's efforts to deliver the VOOs still owed. During these conversations, Goldman informed Liberty Mutual that Goldman was still awaiting receipt of VOOs. Goldman assured Liberty Mutual that delivery of the VOOs ultimately would be made, but it could not say when. *Id.* at 84:2–85:24, 94:16–95:25.

In early 2005, after the price of oil had reached the strike price, Liberty Mutual asked Goldman for information about trades made in 2001. May 14 Tr. at 56:14–57:6. After Liberty Mutual received this information, it asked about undelivered VOOs. *Id.* at 59:17–60:14. Goldman was slow to provide a definitive answer, stating only that it was reconciling its positions. Finally, Goldman stated that it was waiting for VOOs to deliver and for the Association to work out a solution to the market problem. During the summer and fall of 2005, Liberty Mutual asked repeatedly whether the VOOs were in yet. Goldman responded each time that the VOOs had not yet arrived. *Id.* at 65:20–25, 91:4–98:17, 120:14–123:12. During the course of these exchanges, Venezuela made two dividend payouts. Had Liberty Mutual had the VOOs, it would have received more than $1.3 million in dividends. May 11 Tr. at 97:14–98:11.

On November 3, 2005, Liberty Mutual made a formal buy-in demand to Goldman. *Id.* at 96:18. In the securities industry, a buy-in is a commonly used process when delivery of a purchased security is not made. Essentially, it is a demand to the non-delivering seller to go out into the marketplace to purchase the security at issue and then deliver it to the purchaser in the original trade. The process is initiated by addressing a formal written buy-in demand to the seller. *Id.* at 98:22–99:7. In accordance with this procedure, Liberty Mutual demanded that Goldman purchase the VOOs that Goldman had failed to deliver, and then to deliver those VOOs to Liberty Mutual. Goldman never responded to this buy-in demand. *Id.* at 99:15–17.

On November 15, 2005, representatives from Liberty Mutual and Goldman participated in a conference call. During the course of that call, Liberty Mutual informed Goldman that Liberty Mutual had made a decision to liquidate its entire position in VOOs and demanded prompt delivery of the securities in light of this decision. In response, Goldman's in-house counsel indicated that Goldman could not comply with this demand and, further, that Goldman might not be legally obligated to deliver the VOOs that it had sold to Liberty Mutual in 2001. When Liberty Mutual stated that this position might require suit, Goldman's counsel responded that such a suit would be barred by the statute of limitations. This conference call was the first time that Goldman informed Liberty Mutual that it would not be delivering the VOOs. *See id.* at 102:10–103:25. That same day, Liberty Mutual sold all the VOOs that it then held. The average price of the VOOs sold was $27. *Id.* at 104:1–19. This lawsuit followed soon thereafter.

## III. DISCUSSION

### A. Date of the Breach

New York law applies to this breach of contract action. Under New York law, the "proper measure of damages for breach of contract is determined by the

loss sustained or gain prevented at the time and place of breach." *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 320 N.Y.S.2d 225, 269 N.E.2d 21, 26 (1971). "The rule is precisely the same when the breach of contract is nondelivery of shares of stock." *Id.; see also Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 197 (2d Cir.2003); *Lucente v. IBM Corp.*, 310 F.3d 243, 262 (2d Cir.2002).

For a failure to deliver securities, "damages are limited to the cost of covering, or replacing the security." *Brown v. Pressner Trading Corp.*, 101 A.D.2d 761, 475 N.Y.S.2d 405, 407 (N.Y.App.Div.1984). The plaintiff has a duty to mitigate once he learns of the breach. Where "the customer fails to cover within a reasonable time damages are limited to the potential cost to cover, measured from the time he learns of the broker's failure and for a reasonable time thereafter in which he must decide his course of action." *Id.; see also Saboundjian v. Bank Audi (USA)*, 157 A.D.2d 278, 556 N.Y.S.2d 258, 261–62 (N.Y.App.Div.1990).

In *Simon*, the Court of Appeals explained that a plaintiff's cause of action "should not and may not be converted into carrying a market 'call' or 'warrant' to acquire the stock on demand if the price rose above its value as reflected in his cause of action." 320 N.Y.S.2d 225, 269 N.E.2d at 26. Measuring damages at the time of breach takes expected lost future profits into account because the stock price should reflect expected future profits. *See Lucente*, 310 F.3d at 262.

Goldman argued that as matter of law, the dates of the breach are the settlement dates because Goldman had promised—and failed—to deliver securities on those dates. New York case law does not, however, support that proposition. Rather, whether the date for performance has been extended is a factual question. When such an extension has been given, breach occurs on the extended settlement date. In *Jeremias v. Shearson Hayden Stone, Inc.*, 72 A.D.2d 506, 420 N.Y.S.2d 881 (N.Y.App.Div.1979), the plaintiff placed a sell order on May 2 with delivery to occur on May 9. *Id.* at 882. When the plaintiff could not make delivery on May 9, he was informed that if delivery did not occur by May 14, the defendant would buy-in the shares and hold the plaintiff responsible for any losses. *Id.* The court held that the breach occurred on the extended settlement date, May 14. *Id.; cf. Schochet v. National Bank*, 127 Misc. 447, 216 N.Y.S. 362, 366 (N.Y.Sup.App.Term 1926) (holding that the date of breach did not occur when the defendant bank failed to make deposit on the agreed date, but several years later, after the bank made repeated promises of eventual delivery).

When, however, there is no extension of the date of performance, breach occurs on the settlement date. *See Harris, Upham & Co. v. Bartlett*, 435 F.2d 855, 856–57 (10th Cir.1971) (holding that breach occurred on settlement date); *Waxman v. Envipco Pickup & Processing Servs.*, No. 02 Civ. 10132(GEL), 2006 WL 1788964, at *4 (S.D.N.Y. June 28, 2006) (holding that there was no waiver when there was no evidence that plaintiff had consented to extension of the date of performance).

This case law comports with the black-letter rule that when a contracting party has waived a right to demand timely performance under a contract, the other party's failure to render such performance within the time required by the contract is not a breach. *Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 451 N.Y.S.2d 663, 436 N.E.2d 1265, 1270 (1982). When there is an extension of time, the breach occurs upon the withdrawal of the waiver and demand for performance by the non-breaching party. *Id.* Since a waiver is not based on consideration, it can be recalled at any time, sub-

ject to estoppel limitations. *Id.* The intent to waive "must be unmistakably manifested, and is not to be inferred from a doubtful or unequivocal act." *Ess & Vee Acoustical & Lathing Contractors, Inc. v. Prato Verde, Inc.,* 268 A.D.2d 332, 702 N.Y.S.2d 38 (N.Y.App.Div.2000) (quotation marks omitted).

■ There may be an outer limit as to how long the plaintiff can rely on a broker's assurances that the security will be delivered. It may be unreasonable for a plaintiff to rely on assurances made numerous times and not fulfilled. *See, e.g., Kregos v. Associated Press,* 795 F.Supp. 1325, 1331 (S.D.N.Y.1992); *Hartog Rahal Foods, Inc. v. Quality Kitchen Corp.,* No. 96 Civ. 4522(JGK)(SEG), 1997 WL 118367, at *4 (S.D.N.Y. Mar. 14, 1997). Nonetheless, reliance on assurances made over the course of several years is not per se unreasonable. *See Schochet v. National Bank,* 216 N.Y.S. at 366 (N.Y.App.Div.1926) (holding that a claim accrued four years after the defendant bank failed to deliver the deposit on an agreed date but made repeated promises that it would do so).

The instant case parallels *Jeremias* and *Schochet.* Liberty Mutual and Goldman bargained for delivery of VOOs by the settlement dates listed in the trade orders. When Goldman could not deliver the VOOs on the settlement dates, Liberty Mutual communicated clearly to Goldman that it would give Goldman more time to obtain the VOOs. Thereafter, when Liberty Mutual inquired about the status of the delivery orders, Goldman assured Liberty Mutual that it was awaiting the delivery of VOOs from counterparties. Although Goldman contends that Liberty Mutual demanded immediate delivery as early as 2002, the jury reasonably found that Liberty Mutual was merely following up on the status of its orders and acquiesced when Goldman repeated promises of eventual delivery.

■ Liberty Mutual was entitled to withdraw its waiver. *Nassau Trust Co.,* 451 N.Y.S.2d 663, 436 N.E.2d at 1270. The jury found that it was not unreasonable for Liberty Mutual to rely on Goldman's promises for more than four years before withdrawing waiver. Both Liberty Mutual and Goldman were aware from the beginning that VOOs were hard to obtain and that it might take time for Goldman to obtain the VOOs to convey to Liberty Mutual. *See Schochet,* 216 N.Y.S. at 364–65 ("The repeated inquiries of the plaintiff and the responses of defendant, suggesting the possibility of the transmission being accomplished if further delay were accorded, would be inexplicable, except upon the theory that both parties wished and understood that the contract was being kept alive and the time of performance either definitely or indefinitely extended.").

Goldman nonetheless argues that the waiver impermissibly exposed Goldman to unlimited market risk. Goldman, however, repeatedly assured Liberty Mutual that it would make good on delivery. In making these assurances, Goldman assented to the waiver and assumed the risk that the markets would shift in the interim. In fact, Goldman continued to make these assurances even after it had made the internal decision not to honor the promises. Had Goldman communicated that decision to Liberty Mutual, Goldman would have fixed the date of breach much earlier. *See Commonwealth Assocs. v. Palomar Med. Techs., Inc.,* 982 F.Supp. 205, 212 (S.D.N.Y.1997) (stating that the date of breach did not occur until the plaintiff learned of the defendant's repudiation of the contract to deliver securities). As it was, Goldman did not tell Liberty Mutual until November 15, 2005 that it would not be delivering the VOOs.

■ Goldman argues that Liberty Mutual had a duty to mitigate damages. As

described, however, the plaintiff has a duty to mitigate only when he learns of the breach. *See Brown,* 475 N.Y.S.2d at 407. Since the date of the breach occurred on November 15, 2005, Liberty Mutual did not have any duty to mitigate damages prior to that date. Liberty Mutual would not have had reason to go out into the marketplace in light of Goldman's repeated promises that it would make delivery as soon as it obtained the VOOs from counterparties.

Finally, Goldman contends that this Court gave an erroneous instruction in response to a jury question. The jury asked whether waiver must be "explicit." This Court answered that waiver did not need to be explicit but that it must be clear. May 16 Tr. at 69:2–4. This Court gave this instruction recognizing that waiver may be demonstrated by conduct alone. *E.g., Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.,* 7 N.Y.3d 96, 817 N.Y.S.2d 606, 850 N.E.2d 653, 658 (2006). Since a waiving party need not explicitly state its intent, the Court's instruction was not erroneous.

## B. Dividend Payments

 Liberty Mutual contends that it is entitled to the dividends that the VOOs paid prior to the date of the breach. Contract damages serve to place an injured party in the position that it would have been but for the breach. *Freund v. Washington Square Press, Inc.,* 34 N.Y.2d 379, 357 N.Y.S.2d 857, 314 N.E.2d 419, 420

(1974). Had Goldman delivered the VOOs on November 15, 2005, Liberty Mutual would not have been entitled to dividends paid prior to that date when it was not a holder of the securities. This case is not like *Flickinger v. Harold C. Brown & Co.,* 789 F.Supp. 616 (W.D.N.Y.1992). In that case, the broker misled the plaintiff into believing that he held certain stock. The court ruled that the plaintiff was entitled to dividends paid while he believed he owned the stock. *Id.* at 620–22. In the instant case, Liberty Mutual was very much aware that it did not hold the VOOs, having waived timely performance. Although Liberty Mutual was entitled to withdraw its waiver, it is estopped from demanding the fruits that it would have had but for the waiver. *See Nassau Trust Co.,* 451 N.Y.S.2d 663, 436 N.E.2d at 1270. Although Liberty Mutual would not have received any dividend payments had the breach occurred on the settlement dates, the value of the VOOs on those dates would have reflected the expected value of the dividend payments. Thus, when Liberty Mutual extended the settlement date, it assumed the risk that dividends would be paid in the interim.[1]

## C. The Peremptory Challenge: "Care about our courts and care about the juries who guide them, because those juries are you."[2]

Empanelment of this case initially drew a venire of 40 jurors. From visual observation, only one was African–American.[3]

---

1. Liberty Mutual alleges that Goldman received dividend payments on VOOs that it held but did not deliver. Liberty Mutual further contends that Goldman breached its duty as broker-dealer when it "placed its own interests ahead of its customer." Pl.'s Reply to Def.'s Mem. in Opp. to Pl.'s Mot. to Amend J. [Doc. No. 103], at 7. To the extent that Liberty Mutual was entitled to these dividends under Massachusetts General Laws, chapter 93A, or some other theory, its motion to amend the complaint simply came too late.

2. Todd R. Young, Law Day Address, Norfolk Juvenile Court, May 17, 2007 (on file in chambers).

3. This is a perennial issue here in the Eastern Division of the District of Massachusetts, which comprises all of the Massachusetts communities east of the Worcester County line. *See United States v. Green,* 389 F.Supp.2d 29, 35–36, 40–49 (D.Mass.2005) (Gertner, J.). To address this issue, our Court, alone among the 94 United States Dis-

The first six jurors seated were white. To improve juror decision making, however, this Court seats the traditional twelve jurors in every case. *EIU Group, Inc. v. Citibank Delaware, Inc.*, 429 F.Supp.2d 367, 367 (D.Mass.2006), *rev'd on other grounds sub nom, Reinhardt v. Gulf Ins. Co.*, 489 F.3d 405 (1st Cir.2007); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 89–90 (D.Mass.2005); *Ciulla v. Rigny*, 89 F.Supp.2d 97, 102 n. 6 (D.Mass.2000); William G. Young, *Vanishing Trials, Vanishing Juries, Vanishing Constitution*, 40 Suffolk U.L.Rev. 67, 84 (2006). The African–American citizen was the ninth juror seated.[4]

Goldman sought peremptorily to challenge the sole African–American juror. This colloquy ensued:

THE COURT: Well, now, we have very few blacks. Why are you challenging him?

GOLDMAN: Your Honor, it's a peremptory challenge.

THE COURT: It may be, but I'm asking you. I'm entitled to, and I do so under *Batson*.

GOLDMAN: Judge, I'm not sure he understands. I think difficulty with language may be a problem for him. It has *nothing to do with him being black*.

LIBERTY MUTUAL: Your Honor, for the record we object to that challenge.

THE COURT: Well, he is the only black person in the venire. And we've got people of equally rather simple, how shall I say this, jobs that are not terribly complex.

No, I'm denying the challenge. He's seated. Your rights are saved.

May 7 Tr. at 34:24–35:14

■■■ Lest there be any doubt or confusion, in ordering the juror seated, this Court explicitly rejected the race-neutral explanation proffered and expressly found, from the improvised and confused reaction of counsel when challenged, that Goldman's peremptory challenge was racially motivated in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Citing "difficulty with language" plays on the worst stereotypes of African–Americans as uneducated and inferior in mental capacity. *See, e.g.,* Tom Smith, *Ethnic Images,* National Opinion Research Center, GSS Topical Report No. 19 (1990), *available at* http://cloud9.norc.uchicago.edu/dlib/t–19.htm (last visited July 18, 2007) (reporting that African–Americans are more likely to be viewed as unintelligent).

Goldman contends that this case is identical to *United States v. Serino*, 163 F.3d 91 (1st Cir.1998). In that criminal case, this Court had denied a peremptory challenge to the only Asian–American prospective juror. Defense counsel had proffered the explanation that the prospective juror was a social worker. On appeal, the First Circuit reversed, noting that a social work-

---

trict Courts, chooses jurors directly from the census lists of each city and town, 28 U.S.C. § 1863(b)(2), and recently amended its plan to require a second summons for another juror to be sent to the same zip code when an original summons is returned as "undeliverable," United States District Court for the District of Massachusetts Plan for Random Selection of Jurors (effective March 1, 2007), *available at* http://www.mad.uscourts.gov/new/revisedjuryplan.pdf (last visited July 18, 2007). In this way, we seek to afford an equal access to jury service to the broadest array of our citizens. Even so, given the demographic make-up of the Eastern Division, the make-up of this particular venire is not atypical.

4. As is exemplified by this case, twelve-person juries increase the diversity of those given the chance to sit. *See, e.g.,* Stephan Landsman, *An Experiment in Larger Juries in Civil Trials,* New York State Bar Journal (Oct.2006), at 21 (noting "overwhelming" experimental data showing that larger juries are more diverse).

er might have difficulty with the defendant's drug use. *Id.* at 93.

Since *Serino* was an appeal from a decision of mine, and since the colloquy in this case was only slightly less terse than that in *Serino*, it is my duty carefully to explain that I am faithfully and expressly implementing the teaching of *Serino*. My error in *Serino* was in rejecting a plausible explanation for striking the juror that was not based on race.

That is hardly the case here. Goldman proffered the race-neutral explanation that "difficulty with language may be a problem" for the prospective juror. May 7 Tr. at 35:6. This Court rejected that explanation because, from personal observation, this particular juror did not have any difficulty understanding instructions and gave appropriate answers in response to the voir dire.[5] Moreover, this Court observes that, unlike the challenged juror, other prospective jurors did express concerns about their abilities to follow the proceedings. Two prospective jurors stated that they had difficulty hearing. In response to their concerns, this Court offered to provide accommodations, including real-time access to the transcripts provided by this Court's excellent stenographer, Donald Womack. *Id.* at 15:4–13; 22:24–23:8. A third prospective juror expressed concern that he would not understand the legal complexities of the case. *Id.* at 24:25–25:13. Goldman did not object to this prospective juror, who was eventually seated. *Id.* at 36:15–37:1.

Finally, this Court observes that the other eleven jurors seated with the African–American juror, who works at a Marriott Hotel, comprised a project manager, a newspaper advertising salesperson, a pediatrician, a chemist, a grants manager, a technical writer, a marketing manager, an auto mechanic, a teacher, a retired scientist and a line cook. *Id.* at 29:2–14, 29:21–30:14, 34:14–16, 36:19–20. No one asked the African–American juror what his duties were at the Marriott Hotel; at most, assumptions were made about the level of his responsibilities. In any event, the presence of blue-collar workers who went unchallenged further undermines the proffered explanation going to the challenged juror's intelligence and mastery of language.[6]

■■■ Goldman challenges the Court for initiating the inquiry. This challenge is misplaced. Jury empanelment is not, nor should it be, left entirely to the attorneys and the adversary process. It is the court that must shoulder the ultimate responsibility for the empanelment of a fair and impartial jury. In order for the promise of *Batson* truly to be fulfilled, therefore, this Court will continue its practice of making inquiry of counsel whenever a peremptory challenge is levied against a protected minority. *See, e.g.,* Transcript of Record at 37:9–38:20, *Woghiren v. Wyeth,* Civ. A. No. 04–12148–WGY (D.Mass. Jan. 3, 2006). What happens then will, of course, depend on the teaching of *Serino*.

5. Goldman's claim that the juror lacked comprehension because he stated that he worked at "Hotel Marriott Rowes Wharf" when the Marriott is actually located nearby on Long Wharf borders on the frivolous. May 7 Tr. at 34:9–10. The juror was simply differentiating his place of employment from the Marriott at Copley Place. Further, Goldman asked for no follow-up clarification to test the juror's understanding had it been genuinely concerned. Goldman did not even raise this is-

sue until its motion for a new trial. Def.'s Mem. [Doc. No. 99], at 19 n.8.

6. Bolstering the finding made at the time the juror was ordered seated, the Court observed that the juror was prompt and attentive throughout the trial. Like the other jurors, he took notes as the trial progressed. The jurors asked four intelligent and perceptive questions during the course of the trial.

## IV. CONCLUSION

For the foregoing reasons, Goldman's motion for judgment as a matter of law or a new trial [Doc. No. 96] is DENIED. Liberty Mutual's motion to amend judgment [Doc. No. 97] is DENIED.

SO ORDERED.